[No. 51443-7. En Banc. September 17, 1987.]

THE STATE OF WASHINGTON, *Respondent,* v. MITCHELL
E. RUPE, *Appellant.*

738

*Clifford F. Cordes III* (of *Swanson, Parr, Cordes, Young-love, Peeples & Wyckoff, P.S.*), for appellant.

*Patrick D. Sutherland, Prosecuting Attorney,* and *Gary R. Tabor, Chief Criminal Deputy,* for respondent.

BRACHTENBACH, J.—On June 7, 1984, this court affirmed defendant Mitchell E. Rupe's conviction of two counts of aggravated first degree murder and two counts of robbery in the first degree. The court reversed his death sentence because the trial court erroneously admitted evidence of Rupe's gun collection in the penalty phase of his trial. *State v. Rupe,* 101 Wn.2d 664, 683 P.2d 571 (1984) (*Rupe* I). The court remanded for a new sentencing proceeding. The jury impaneled for the resentencing trial unanimously determined that there exist no sufficient mitigating circumstances to merit leniency. The trial judge then sentenced Rupe to be executed. This review is mandatory pursuant to RCW 10.95.100. In addition, Rupe has appealed, raising a number of issues. We affirm the sentence.

Rupe's conviction resulted from the September 1981 shooting deaths of two bank tellers, Candace Hemmig and Twila Capron, during the course of a bank robbery in West Olympia. The facts surrounding the crime are set forth in *Rupe* I. Following reversal of the death sentence, the mandate was issued on August 8, 1984. On August 17, 1984, the trial court issued an order setting the resentencing trial for October 1, 1984. On September 17, 1984, the trial court issued an order appointing counsel for Rupe. The attorney appointed had been Rupe's appointed counsel for the original trial and for the first appeal. Three days before the resentencing trial was to begin, Rupe was transported from Walla Walla to Thurston County pursuant to court order. Rupe was present before the trial court on the date the proceedings were scheduled to begin, October 1, 1984.

On that date, defense counsel moved for dismissal of the

proceedings, or, in the alternative, for a continuance. Counsel argued that the State had not filed a notice of intent to reseek the death penalty nor otherwise notified Rupe of its intent to reseek the death penalty. Counsel also argued that Rupe was not represented by counsel when the trial date was set. The court denied the motion to dismiss, but continued the trial to January 7, 1985. Also on October 1, 1984, Rupe orally waived any speedy trial rights and later filed a written waiver of any speedy trial rights. Subsequently, Rupe moved to exclude all evidence of the facts and circumstances of the crime. The trial court denied the motion.

On January 7, 1985, jury selection began. Rupe moved to quash the jury panel of 100 persons on the ground that they did not represent a fair cross section of the community. He based this argument on the fact that of the 100 persons selected, only three were under 40 years old, and none were under 35. The trial court denied the motion.

During jury selection, Rupe challenged six jurors for cause. Three of these jurors were excused, the others were not. Rupe also exercised all twelve of his peremptory challenges.

Following selection of the jury, Rupe moved for a change of venue, arguing that due to pretrial publicity he could not obtain a fair and impartial trial in Thurston County. In support of his motion for change of venue he again argued that, based upon age, the jury panel did not represent a fair cross section of the community. The trial court denied the motion for change of venue.

Rupe next filed a waiver of trial by jury, stating that he did so due to the trial court's denial of his motion for change of venue and his belief that he could not obtain a fair trial with the jury as composed. The court denied Rupe's request to waive his right to trial by jury. Rupe then requested additional peremptory challenges. The court granted two additional peremptory challenges which Rupe exercised. Two of the alternate jurors were then seated on the jury and additional alternates were selected. None of

the jurors ultimately impaneled knew of Rupe's prior sentence, his appeal, this court's reversal of his sentence, or of Rupe's gun collection.

Additional facts pertaining to alleged errors involving admission of certain photographic evidence, the propriety of certain questions on cross examination, and jury instructions and proposed jury instructions are set forth below.

Following the jury's unanimous finding that there were not sufficient mitigating circumstances to merit leniency, the trial court sentenced Rupe to be executed. Rupe appealed. This case is before this court for mandatory review, with which Rupe's appeal is consolidated.

## I

Rupe argues that his statutory and due process rights were violated because the State did not file a notice of intent to reseek the death penalty and failed otherwise to notify Rupe of its intent to reseek the death penalty.

RCW 10.95.040 requires that the prosecuting attorney file written notice of a special sentencing proceeding when the death penalty is sought. If the prosecuting attorney does not file and serve the notice according to the statutory procedures, he may not request the death penalty. RCW 10.95.040(3). RCW 10.95.040 applies by its terms only to the prosecutor's original decision to seek the death penalty. There is no statutory requirement that the prosecutor file a second notice of a special sentencing proceeding when a defendant's conviction is upheld on appeal but the case is remanded for a new sentencing proceeding. Thus, there is no statutory violation here.

There also is no due process violation based upon lack of notice. In *Rupe* I, at 710–11, this court directed: "[T]he case is remanded for a new sentencing proceeding, with a new jury, in accordance with the principles set forth above, to determine whether the death penalty should be imposed." Clearly, Rupe was informed that the death penalty would be again at issue. Moreover, even if there were a due

process notice problem here, which there is not, Rupe has shown no resulting prejudice.

## II

Rupe argues that his right to counsel was violated by the court's failure to appoint an attorney for him until 2 weeks before the date the resentencing trial was originally scheduled to begin. He reasons that the setting of the trial date, which occurred earlier, was a critical stage of the proceedings at which an indigent defendant is entitled to appointed counsel. He claims that counsel was unable to prepare in 2 weeks' time, and that he was, therefore, forced to ask that the death penalty proceedings be dismissed or that they be continued past any existing speedy trial requirement.

Sentencing is a critical stage of the proceedings, at which a defendant is constitutionally entitled to be represented by counsel. *Mempa v. Rhay,* 389 U.S. 128, 19 L. Ed. 2d 336, 88 S. Ct. 254 (1967). Generally, this right exists whenever a court considers any matter in connection with a defendant's sentence. 3 C. Wright, *Federal Practice* § 525, at 81 (1982). This right extends to resentencing. *Johnson v. United States,* 619 F.2d 366 (5th Cir. 1980).

Rupe was entitled to counsel when the resentencing trial date was set. However, CrR 3.1(b)(2) provides that counsel initially appointed to represent a defendant "shall continue to represent the defendant through all stages of the proceedings unless a new appointment is made by the court following withdrawal of original counsel . . ." Nothing in the record suggests that defense counsel ever officially withdrew, pursuant to CrR 3.1(e), from representation of Rupe. Thus, Rupe had appointed counsel throughout these proceedings. The trial court's "formal reappointment" of counsel appears to have been an exercise of caution, rather than a necessary action.

Nonetheless, evidently neither defense counsel nor Rupe was actually present when the trial date was set. Although not the thrust of Rupe's argument on this issue, it

might be argued that because defense counsel was not present at the setting of the resentencing trial date, there was a violation of Rupe's right to have his counsel present whenever any matter in connection with his sentence was considered. *See* 3 C. Wright, *Federal Practice* § 525, at 81 (2d ed. 1982). (The record is not clear, but it appears defense counsel was unaware in advance of the setting of the trial date.) Even so, Rupe does not establish that he was prejudiced. The defense motion to continue the proceedings was granted. Thus, a new date was set when defense counsel was present and counsel had ample time to prepare.

Moreover, despite Rupe's claim to the contrary, there is no speedy trial problem here. While this court has recognized a right to speedy sentencing, this right is not defined by the "60–day rule" of CrR 3.3, but rather by constitutional bounds. *See State v. Johnson,* 100 Wn.2d 607, 629, 674 P.2d 145 (1983), *overruled in part on other grounds in State v. Bergeron,* 105 Wn.2d 1, 711 P.2d 1000 (1985). Any delay in these resentencing proceedings would constitute a violation of the right to speedy sentencing only if such delay was "purposeful or oppressive." *State v. Johnson, supra* at 629; *see Pollard v. United States,* 352 U.S. 354, 361, 1 L. Ed. 2d 393, 77 S. Ct. 481 (1957). In determining whether a violation has occurred four factors are balanced: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) the extent of any prejudice to the defendant. *State v. Johnson, supra* at 629; *State v. Braithwaite,* 34 Wn. App. 715, 667 P.2d 82 (1983).

Applying these factors: The resentencing trial commenced 5 months after the mandate was issued. According to Rupe the delay was necessary due to defense counsel's need for time to prepare. Because original counsel was in fact still Rupe's appointed counsel, the delay is attributable to the defense. Rupe was therefore not "forced" to seek a continuance past any speedy sentencing requirement. Rupe waived any speedy trial right. Finally, and determinative on this question, Rupe was not prejudiced by the delay. No speedy sentencing violation occurred.

## III

Rupe argues that his due process rights were violated because the State did not bring him before the trial court in a timely manner.

■ Rupe attempts to analogize to criminal court rules, including the speedy trial rule, which set specific time requirements for various proceedings. Rupe cites no other authority. The most apparent analogous cases involve allegations of Fifth Amendment due process violations resulting from preindictment delay. *See, e.g., United States v. Moran,* 759 F.2d 777 (9th Cir. 1985), *cert. denied,* 474 U.S. 1102, 88 L. Ed. 2d 920, 106 S. Ct. 885 (1986) (Washington case); *State v. Ansell,* 36 Wn. App. 492, 675 P.2d 614 (1984). In such a case, a defendant must show actual prejudice resulting from the delay. *United States v. Lovasco,* 431 U.S. 783, 52 L. Ed. 2d 752, 97 S. Ct. 2044 (1977). Rupe has not shown, nor attempted to show, any prejudice to his ability to present his evidence. We find no violation of Rupe's due process rights.

■ Rupe evidently also believes his right to be present at the proceedings was violated. CrR 3.4 provides that a defendant must be present at arraignment and at every stage of the trial, including the imposition of sentence. Also, a defendant has a constitutional right to be present at sentencing, including resentencing. *Paul v. United States,* 734 F.2d 1064 (5th Cir. 1984). The only time that Rupe was not present was when the resentencing trial date was first set. Because the trial court granted Rupe's motion for a continuance, and a new trial date was set while Rupe and his counsel were present, we find no reversible error.

## IV

Rupe argues that the resentencing trial resulted in his being twice placed in jeopardy for the same offense in violation of article 1, section 9 of our state constitution and the Fifth Amendment to the federal constitution.

The United States Supreme Court has held that a defendant who obtains a new trial can be retried and sub-

ject to a harsher sentence because the original conviction has been nullified and "the slate wiped clean." *North Carolina v. Pearce,* 395 U.S. 711, 721, 23 L. Ed. 2d 656, 89 S. Ct. 2072 (1969). That rationale does not apply, however, "whenever a jury agrees or an appellate court decides that the prosecution has not proved its case." *Bullington v. Missouri,* 451 U.S. 430, 443, 68 L. Ed. 2d 270, 101 S. Ct. 1852 (1981).

*Bullington* involved the Missouri death penalty statute which required the prosecution in a separate penalty phase of the trial to prove beyond a reasonable doubt certain aggravating circumstances. Four features of the Missouri procedure set it apart from sentencing proceedings addressed by the Court in earlier double jeopardy analyses: (1) the nature of the sentencing proceeding as a separate penalty phase of the trial; (2) the fact that the prosecution had to prove specific aggravating circumstances; (3) the "beyond a reasonable doubt" proof standard required under the statute; and (4) the limited discretion of the jury (which could unanimously vote for the death penalty; if the jury did not do so, the defendant would be subject to life imprisonment without possibility of parole for 50 years).

The Court described these features as "the hallmarks of the trial on guilt or innocence." *Bullington,* at 438–39. With these features, it is possible to determine whether the prosecution has failed to meet its burden of proof, unlike the situation in prior cases decided by the Court which involved discretionary and essentially standardless sentencing proceedings. *Bullington,* at 440, 443–44. The Court said that "[b]y enacting a capital sentencing procedure that resembles a trial on the issue of guilt or innocence . . . Missouri *explicitly requires* the jury to determine whether the prosecution has 'proved its case.'" *Bullington,* at 444.

Because the jury in *Bullington* had not unanimously voted for the death sentence in the first sentencing proceeding, the life sentence the defendant received meant that the jury had acquitted the defendant of whatever was necessary for imposition of the death sentence. *Bullington,*

at 445. Under double jeopardy principles, an acquittal on the issue of guilt or innocence is final. *Bullington,* at 445. Hence, the defendant could not be subjected in the second sentencing proceeding to the death penalty.

The sentencing proceeding in Washington is similar to that of Missouri in these respects: the separate nature of the sentencing proceeding; the "beyond a reasonable doubt" proof standard; and the limited discretion of the jury. The major difference is that in Washington the State must prove aggravating factors at the guilt phase of the trial, and must prove beyond a reasonable doubt the absence of mitigating factors in the penalty phase. Despite this difference, the State must nonetheless prove matters in the sentencing phase, similar to the requirement in *Bullington* that the State prove aggravating factors in the sentencing phase. Thus, like that of Missouri, Washington's sentencing proceeding is not a discretionary, standardless proceeding. It is possible to determine whether the State has met its burden of proving beyond a reasonable doubt the absence of mitigating factors. *See Bullington; State v. Hennings,* 100 Wn.2d 379, 385–87, 670 P.2d 256 (1983) (involving habitual criminal proceedings). Therefore, double jeopardy principles apply in a second capital sentencing proceeding under this State's statutes.

Double jeopardy principles do not, however, mean that a defendant cannot be exposed to the death sentence in a second sentencing proceeding, provided: the appellate court's reversal of the original death sentence was not based upon insufficiency of the State's evidence, *see State v. Anderson,* 96 Wn.2d 739, 638 P.2d 1205, *cert. denied,* 459 U.S. 842, 74 L. Ed. 2d 85, 103 S. Ct. 93 (1982); and the jury in the first sentencing proceeding returned a death verdict. In such a case, the death verdict returned by the first jury does not establish that the State failed to carry its burden of proof in the first proceeding. Moreover, the defendant is not exposed to a harsher sentence in the second proceeding than that invoked by the first jury. This is the case here.

Rupe maintains, however, that the State's introduction of

evidence of his gun collection in the first proceeding is analogous to the situation where the State intentionally provokes a defendant into moving for a mistrial, which is granted. Where the State deliberately provokes such a mistrial, double jeopardy principles bar retrial. *See United States v. Dinitz,* 424 U.S. 600, 47 L. Ed. 2d 267, 96 S. Ct. 1075 (1976). Rupe concedes in his brief that the State's introduction of the evidence was not an intentional attempt to provoke him into moving for a mistrial. Brief of Appellant, at 39–40. Moreover, he presents no authority supporting his position. We are unpersuaded by the attempted analogy. We reject the proposition that the State's introduction of evidence ultimately declared by an appellate court to be constitutionally impermissible necessarily bars retrial following a defendant's successful appeal.

## V

Rupe argues that he was denied his right to trial by a jury composed of a fair cross section of the community because, of the 100 persons selected for the jury panel, none were under 35 years old and only 3 were under 40 years old.

▆ A criminal defendant has a Sixth Amendment right to be tried by a jury that is drawn from a source fairly representative of the community. *Taylor v. Louisiana,* 419 U.S. 522, 538, 42 L. Ed. 2d 690, 95 S. Ct 692 (1975); *State v. Hilliard,* 89 Wn.2d 430, 440, 573 P.2d 22 (1977). To establish a prima facie violation of the fair–cross–section requirement, the burden is on the defendant to show

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury–selection process.

*Duren v. Missouri,* 439 U.S. 357, 364, 58 L. Ed. 2d 579, 99 S. Ct. 664 (1979).

Jurors in this state are selected at random from voter registration lists according to the provisions in RCW 2.36-

.060. In Thurston County a computerized random selection system is used to select a panel from approximately 61,000 registered voters.

■ To satisfy the first element of the *Duren* test, Rupe must show that jurors 18 to 34 years of age (or 18 to 40) constitute a distinctive group in our society. A number of courts have concluded that a group of people defined by a particular age range is not a distinctive group in the community for Sixth Amendment purposes. *See, e.g., United States v. Potter,* 552 F.2d 901 (9th Cir. 1977) (18 to 34 not a cognizable group); *Barber v. Ponte,* 772 F.2d 982 (1st Cir. 1985), *cert. denied,* 475 U.S. 1050, 89 L. Ed. 2d 580, 106 S. Ct. 1272 (1986) (18 to 34 not cognizable); *United States v. Olson,* 473 F.2d 686 (8th Cir.), *cert. denied,* 412 U.S. 905, 36 L. Ed. 2d 970, 93 S. Ct. 2291 (1973) (18 to 20 not cognizable). In deciding whether there is a distinctive (or cognizable) group, courts have looked to whether (1) the group is defined and limited by some identifiable factor, (2) a common thread or basic similarity in attitude, ideas, or experience run through the group, and (3) there is a community of interest among the members of the group, such that the group's interests cannot be adequately represented if the group is excluded from the jury process. *Barber v. Ponte, supra* at 997; *Willis v. Zant,* 720 F.2d 1212, 1216 (11th Cir. 1983), *cert. denied,* 467 U.S. 1256, 82 L. Ed. 2d 849, 104 S. Ct. 3546 (1984). We are unconvinced that the latter two factors are satisfied by particular age categorizations. We also note that delineation of a particular age range is necessarily arbitrary. *See Barber,* at 998–99. Thus, we are not persuaded that Rupe has satisfied the first element of the *Duren* test.

Regardless of whether he has done so, he has clearly failed in his burden of satisfying the final two elements of the *Duren* test. He has presented no evidence whatsoever that persons aged 18 to 34 or those 18 to 40 are underrepresented on Thurston County's voter registration lists. Rupe thus has failed to prove that these lists do not constitute a fair cross section of the community and that their

use is therefore inherently unconstitutional. *See State v. Hilliard, supra* at 441. Moreover, Rupe's counsel concedes that the defense has not proven that there has been a systematic exclusion of persons 18 to 34 years of age (or 18 to 40) in the jury selection process. Brief of Appellant, at 47.

In short, the fact that there were no people 18 to 34 years of age (and only three under 40) on *this* panel is not enough to establish a violation of Rupe's right to trial by a jury composed of a fair cross section of the community.

## VI

 Rupe argues that he was denied his right to a fair and impartial jury as a result of the trial court's refusal to excuse three jurors he challenged for cause. He contends that the challenged jurors were predisposed to invoke the death penalty. Under the Sixth Amendment and article 1, section 22 of the state constitution, a defendant is guaranteed the right to a fair and impartial jury. A party may challenge a juror for cause. CrR 6.4(c)(1). Granting or denying a challenge for cause is within the discretion of the trial court, and will be reversed only for manifest abuse of discretion. *State v. Gilcrist,* 91 Wn.2d 603, 611, 590 P.2d 809 (1979). A trial court need not disqualify a juror with preconceived ideas if the juror can "'"put these notions aside and decide the case on the basis of the evidence given at the trial and the law as given him by the court."'" *State v. Mak,* 105 Wn.2d 692, 707, 718 P.2d 407, *cert. denied,* __ U.S. __, 93 L. Ed. 2d 599, 107 S. Ct. 599 (1986).

Rupe challenged each juror for actual bias, which is the existence of a state of mind which satisfies the court that the potential juror "cannot try the issue impartially and without prejudice to the substantial rights of the party challenging . . ." RCW 4.44.170(2).

Two of the challenged jurors gave answers during individual voir dire which indicated that they believed someone convicted of two premeditated murders, under circumstances like those here, should receive the death penalty. One of these jurors also gave answers indicating that she

believed the burden was on the defendant to show mitigating circumstances. Upon questioning by the court, both of these jurors responded that they would follow the court's instructions and decide the case based upon the law as given by the court after considering all of the evidence.

The responses of both jurors were equivocal. Equivocal answers alone do not, however, require that a juror be removed when challenged for cause. The question is whether a juror with preconceived ideas can set them aside. The trial judge is best situated to determine a juror's competency to serve impartially. *Patton v. Yount,* 467 U.S 1025, 1039, 81 L. Ed. 2d 847, 104 S. Ct. 2885 (1984); *State v. Gosser,* 33 Wn. App. 428, 434, 656 P.2d 514 (1982). The trial judge is able to observe the juror's demeanor and, in light of that observation, to interpret and evaluate the juror's answers to determine whether the juror would be fair and impartial. *Patton v. Yount, supra* at 1038; *Briley v. Bass,* 750 F.2d 1238, 1246 (4th Cir. 1984), *cert. denied,* 470 U.S. 1088, 85 L. Ed. 2d 152, 105 S. Ct. 1855 (1985); *State v. Gosser, supra* at 434.

We have reviewed the voir dire of these two jurors, and conclude that the trial court did not manifestly abuse its discretion in denying Rupe's challenges of them for cause.

Moreover, Rupe could not, in any event, show that he was prejudiced by the court's denial of his challenges of these two jurors for cause. The trial court granted Rupe 2 peremptory challenges in addition to the 12 he was permitted under RCW 10.95.050(4). Both of these jurors were ultimately excused through Rupe's exercise of peremptory challenges. A defendant's use of a peremptory challenge to remove a juror who should have been removed for cause "cures" any error. *State v. Latham,* 100 Wn.2d 59, 64, 667 P.2d 56 (1983); *See United States v. Tweed,* 503 F.2d 1127 (7th Cir. 1974). Rupe would, therefore, have to show that he was prejudiced by having to use peremptory challenges to remove jurors who should have been removed for cause. *Latham,* at 64. He cannot do so. In light of the two additional peremptory challenges granted, Rupe was not denied

a fair and impartial jury even if the court erred by denying these two challenges for cause.

Rupe's third challenge for cause, which the trial court denied, concerns a juror who had read or heard that Rupe had been sentenced to death in the prior proceeding, and had appealed. This juror stated that he thought the first jury had done a good job. The juror assured the court that he could render a verdict based upon the evidence presented at the hearing. Rupe evidently believes that this juror's knowledge of the prior proceedings biased the juror.

Knowledge of prior proceedings alone is insufficient to establish juror bias. *Patton v. Yount, supra* at 1035. After reviewing this juror's voir dire, we conclude that the trial court was well justified in determining that this juror's knowledge did not predispose him to impose the death penalty. The trial court did not manifestly abuse its discretion in denying Rupe's challenge of this juror for cause.

## VII

Rupe argues that his right to a fair and impartial trial by jury was denied because the trial court denied his motion for a change in venue. He maintains that pretrial publicity affected the jury's ability to fairly and impartially decide this matter.

The decision to grant or deny a motion for change of venue is within the trial court's discretion. *Rupe I*, at 674. The motion should be granted when necessary to provide the defendant his due process guaranty of a fair and impartial trial. *Rupe I*, at 674; *See State v. Stiltner*, 80 Wn.2d 47, 491 P.2d 1043 (1971). The defendant only need show a probability of unfairness or prejudice. *Rupe I*, at 674; *see Sheppard v. Maxwell*, 384 U.S. 333, 16 L. Ed. 2d 600, 86 S. Ct. 1507 (1966). Courts are, however, reluctant to disturb the trial court's discretion to decide motions for change of venue. *Rupe I*, at 674; *Stiltner*, at 52.

Rupe maintains that the length of time this case has been pending and the number of proceedings which have been publicized are factors which indicate that the

trial court should have granted his motion for change of venue. In *Patton v. Yount, supra,* the United States Supreme Court addressed the problem of pervasive media publicity which arises in the trial of "sensational criminal cases." The Court observed that in its opinion in *Irvin v. Dowd,* 366 U.S. 717, 6 L. Ed. 2d 751, 81 S. Ct. 1639 (1961), it had held that adverse pretrial publicity can create a presumption in a community that juror's claims that they could be impartial should not be believed; the totality of the circumstances is examined in deciding whether such a presumption arises. *Patton v. Yount, supra* at 1031. The trial court's findings of impartiality are reversible only for "manifest error." *Patton v. Yount, supra* at 1031.

The Court in *Patton* questioned whether there was sufficient adverse publicity there to raise a presumption that claims of impartiality be disbelieved. *Patton v. Yount, supra* at 1032–33. Of more significance to Rupe's claims here, however, the Court in *Patton* concluded that the passage of time, 4 years, between the first, highly publicized trial and the second, lesser publicized trial served to clearly rebut "any presumption of partiality or prejudice that existed at the time of the initial trial." *Patton v. Yount, supra* at 1035. The Court said that the fact that the great majority of veniremen remembered the case was, without more, irrelevant. The relevant question remained whether the jurors at the second trial had such fixed opinions that they could not act impartially. *Patton v. Yount, supra* at 1035.

Similarly, here the length of time involved served to blunt opinions once held by prospective jurors. As in *Patton,* there was considerably less publicity attendant to the second trial than to the first. The length of time involved and the number of proceedings in this case do not indicate that the trial court abused its discretion in denying Rupe's change of venue motion.

This court has recognized other factors which aid the inquiry of whether the trial court abused its discretion in denying a motion for change of venue:

(1) the inflammatory or noninflammatory nature of the publicity; (2) the degree to which the publicity was circulated throughout the community; (3) the length of time elapsed from the dissemination of the publicity to the date of trial; (4) the care exercised and the difficulty encountered in the selection of the jury; (5) the familiarity of prospective or trial jurors with the publicity and the resultant effect upon them; (6) the challenges exercised by the defendant in selecting the jury, both peremptory and for cause; (7) the connection of government officials with the release of publicity; (8) the severity of the charge; and (9) the size of the area from which the venire is drawn.

*Rupe* I, at 675 (citing *State v. Crudup,* 11 Wn. App. 583, 587, 524 P.2d 479, *review denied,* 84 Wn.2d 1012 (1974)). The *Crudup* factors may not be dispositive in every change of venue case. *Rupe* I, at 675.

Turning to these factors, there was considerable publicity in Thurston County about the crime and the investigation, as well as about the trial and the first sentencing proceedings, including generally accurate summaries of testimony and other evidence. There was also publicity about Rupe on death row, and about this court's reversal of his death sentence. The publicity was largely factual in nature.

Contrary to Rupe's position, widespread publicity of a factual, noninflammatory nature does not justify a change in venue. *Rupe* I; *State v. Crudup, supra.* This view is consistent with the vast majority of decisions. *See generally* Annot., *Pretrial Publicity in Criminal Case as Ground for Change of Venue,* 33 A.L.R.3d 17, § 8 (1970).

As to the second factor, there is no question that the publicity was widespread. With regard to the third, fourth and fifth factors: Most of the publicity surrounding this case involved the crime, the investigation, and the later guilt and sentencing phases of the original trial. There was some publicity relating to this court's reversal of Rupe's sentence, and some publicity attendant to the resentencing proceedings. The record shows that lengthy and exhaustive individual voir dire was conducted in part to be sure that

jurors were not influenced by publicity. (Significantly, however, much of the questioning was concerned with death qualifying the jury, rather than with the effect of publicity.) In a case of this sensitivity, the care used in selecting the jury, and the length of time seating the jury (11 days), are not unusual. Because the jury was necessarily informed that Rupe was convicted of the crimes charged, Rupe was not prejudiced by any juror's recollection of factual accounts of the crime and Rupe's involvement.

With respect to the remaining factors: Rupe exercised all of his peremptory challenges and two additional peremptory challenges granted by the court. He challenged six jurors for cause. Three of those challenges were granted. There is no claim that government connection with release of publicity is involved. The charge against Rupe is the most severe. Finally, the venire is drawn from Thurston County's over 61,000 registered voters.

On balance, applying these factors and considering the opinion in *Patton,* we hold that the trial court did not abuse its discretion by denying Rupe's motion for change of venue.

## VIII

Rupe argues that the trial court erred when it refused to accept his written waiver of his right to trial by jury.

There is no constitutional right to a nonjury trial. *Singer v. United States,* 380 U.S. 24, 13 L. Ed. 2d 630, 85 S. Ct. 783 (1965); *State v. Thompson,* 88 Wn.2d 13, 558 P.2d 202, *appeal dismissed,* 434 U.S. 898, 54 L. Ed. 2d 185, 98 S. Ct. 290 (1977). In a special sentencing proceeding in a capital case, however, a jury may be waived in the discretion of the court and with the consent of the defendant and the prosecuting attorney. RCW 10.95.050(2). Absent a showing that a trial court's withholding of assent to a waiver was an abuse of discretion, that is, that it was clearly untenable or manifestly unreasonable, or that the defendant was prejudiced by having his cause heard by a jury, there is no reversible error. *State v. Jones,* 70 Wn.2d

591, 424 P.2d 665 (1967); *State v. Maloney,* 78 Wn.2d 922, 481 P.2d 1 (1971).

Rupe attempted to waive the jury based upon the trial court's denial of his motion for a change of venue, and his belief that he could not obtain a fair trial with the jury as composed. The trial court explained its refusal to assent on the basis that (1) there would be serious questions as to whether the waiver was freely and voluntarily given, since it was given only because Rupe believed he could not receive a fair jury trial; (2) assenting to the waiver would be implied recognition that the assembled jury was not fair and impartial (a proposition with which the trial court emphatically disagreed); and (3) the court doubted whether this case was an appropriate one in which to permit waiver of the jury.

The trial court's reasons for declining to assent are not clearly untenable nor manifestly unreasonable. Moreover, Rupe has not shown any prejudice resulting from having a jury hear this matter. In addition, there is no prejudice resulting from this jury having heard this matter. As discussed above, the trial court properly ruled on Rupe's motion for change of venue and his challenges to individual jurors. Rupe received a fair jury trial. The trial court did not err by refusing to assent to waiver of trial by jury.

IX

Rupe argues that the trial court erred by admitting evidence at the resentencing trial of the facts and circumstances of the crime. He reasons that his guilt or innocence was not an issue in the proceeding. He also relies upon RCW 10.95.060(4), which recites the question the jury in a capital sentencing proceeding must resolve: "'Having in mind *the crime of which the defendant has been found guilty,* are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?'" (Italics ours.) Rupe maintains that the words "the crime of which the defendant has been found guilty" mean only the description of first degree aggravated murder

and the aggravating factors, and do not mean "facts and circumstances surrounding the crime."

 RCW 10.95.060(3) provides, however:

In addition to evidence of whether or not there are sufficient mitigating circumstances to merit leniency, if the jury sitting in the special sentencing proceeding has not heard evidence of the aggravated first degree murder of which the defendant stands convicted, both the defense and prosecution may introduce evidence concerning the facts and circumstances of the murder.

RCW 10.95.060(3) requires that evidence of the facts and circumstances of the crime from the guilt phase be admissible in the penalty phase where a new jury is impaneled for the sentencing proceeding. *Accord, State v. Mak*, 105 Wn.2d 692, 730, 718 P.2d 407, *cert. denied*, ___ U.S. ___, 93 L. Ed. 2d 599, 107 S. Ct. 599 (1986); *State v. Bartholomew*, 101 Wn.2d 631, 643, 683 P.2d 1079 (1984) (*Bartholomew II*). This procedure comports with the usual proceedings where the same jury hears the evidence in the guilt phase as decides the death penalty question.

Aside from the statutory requirement, evidence of the circumstances of the crime is a constitutionally necessary aspect of a jury's decision whether to impose the death penalty. The jury must, in selecting those defendants who will actually be sentenced to death, make "an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Zant v. Stephens*, 462 U.S. 862, 878–79, 77 L. Ed. 2d 235, 103 S. Ct. 2733 (1983); *see also Woodson v. North Carolina*, 428 U.S. 280, 49 L. Ed. 2d 944, 96 S. Ct. 2978 (1976); *State v. Mak*, *supra* at 723.

Accordingly, the trial court did not err when it permitted the State to introduce evidence of the facts and circumstances of the crime.

## X

Rupe argues that the trial court erred by admitting certain photographic exhibits. Six of the photographs show areas of the bank's interior, blood spatters, bone fragments

and flesh. The seventh is a photograph of the victims, the area immediately surrounding the bodies, a large blood pool, and blood stains on the floor and other surfaces. Rupe claims the photographs are irrelevant, cumulative, and highly prejudicial.

Initially, the State argues that Rupe should not be permitted to object now to two of the exhibits, because he did not object to their admissibility at the sentencing proceeding. In a capital case, this court will review issues where no proper objection was made at trial. *State v. Jeffries,* 105 Wn.2d 398, 418, 717 P.2d 722, *cert. denied,* ___ U.S. ___, 93 L. Ed. 2d 301, 107 S. Ct. 328 (1986). Therefore, we will consider all of the photographs.

Evidence must be relevant to be admissible. ER 401. Rupe argues that the seven photographs at issue are not relevant because they have no bearing on whether there are sufficient mitigating circumstances to warrant leniency. As discussed above, evidence of the facts and circumstances of the crime is admissible in a capital sentencing proceeding where the jury hearing the evidence is not the same jury which heard the evidence at the guilt phase. These photographs are relevant insofar as the facts and circumstances of the crime are concerned.

First, all the exhibits properly acquaint the jury with the scene of the crime. Second, each of these photographs is relevant to expert testimony about the circumstances of the murders. Contrary to Rupe's claim that the six photographs showing blood spatters, bone fragments and flesh only show the distance these materials went from the point of impact (and therefore only inflame the jury), these photographs are evidence of the "blow–back" effect, testified to by two expert State's witnesses. Blow–back refers to a phenomenon occurring when a fired bullet enters a victim from a close range; matter is blown back from the wound. The record shows that unrefuted testimony by a criminalist, a forensic pathologist, and a ballistics expert was consistent in suggesting that Candace Hemmig was shot with the gun muzzle about 6 inches away, and that Twila Capron was

shot with the gun muzzle about 2 feet away. In his confessions, which were admitted at this proceeding, Rupe said he shot the tellers from close range.

There is no merit to Rupe's apparent claim that testing and typing of the blood, bone and flesh was required before the photographs can be considered relevant. The criminalist investigator on the scene identified the blood, bone and flesh based upon his experience investigating over 500 homicide scenes.

The seventh photograph is also relevant to the facts and circumstances of the crime. As the trial court found, this exhibit provides the best photographic representation of various items to the bodies. This photograph is also relevant to expert testimony about the circumstances of the murders.

Relevant evidence may be excluded if its probative value is outweighed by prejudicial effect. ER 403; *State v. Guloy,* 104 Wn.2d 412, 705 P.2d 1182 (1985), *cert. denied,* 475 U.S. 1020, 89 L. Ed. 2d 321, 106 S. Ct. 1208 (1986). The balancing of probative value against prejudicial effect is left to the discretion of the trial court and is reviewed only for abuse of discretion. *State v. Harris,* 106 Wn.2d 784, 791, 725 P.2d 975 (1986), *cert. denied,* __ U.S. __, 94 L. Ed. 2d 781, 107 S. Ct. 1592 (1987).

Rupe claims that all of the photographs are cumulative and prejudicial, and, particularly, that the photograph showing the two victims depicts a gruesome scene and is highly prejudicial.

Whether the photographs are cumulative is debatable. Each photograph is somewhat different from any other photographic exhibit in showing conditions of the scene. While perhaps six photographs are more than enough to demonstrate the blow–back effect, we are convinced that the trial court did not abuse its sound discretion in concluding that the probative value of these six photographs outweighed any prejudicial effect. The seventh exhibit, showing the bodies, is certainly disturbing. It is not, however, so gruesome as to be highly prejudicial on that basis

alone. We conclude that the trial court did not abuse its discretion in admitting the photographs.

## XI

Rupe argues that the trial court erred in permitting the deputy prosecutor to ask him during cross examination about the possibility that his sentence might be commuted.

On direct examination, defense counsel asked Rupe:

Q. Mitch, at best, you will be looking at Walla Walla for the rest of your life.
A. Life without parole.

Report of Proceedings, at 3306.

On cross examination, the following occurred:

Q. You indicated you are resolved to spending the rest of your life in prison without parole?
A. If that's what my sentence is, yes.
Q. Is there some thought in your mind [that] you might get pardoned by the Governor at some point?

. . .

Q. Is there some thought that your sentence might someday be commuted?
[Defense counsel]: Objection; that is not appropriate.
The Court: Overruled.

. . .

Q. I'm asking about commutation of the sentence, your sentence might be commuted.
A. At this point, no I don't think so.

Report of Proceedings, at 3311–12.

In its instructions, the court informed the jury that if Rupe were not sentenced to death, he would be sentenced to life without parole. The court also informed the jury that a person sentenced to life imprisonment without possibility of release or parole could not have the sentence suspended, deferred or commuted by any judicial officer, and that the Board of Prison Terms and Paroles could not parole the prisoner nor reduce the time to be served.

Rupe contends that the questioning about possible commutation was irrelevant to whether or not there were sufficient mitigating factors to warrant leniency, and was not in rebuttal to defense evidence. He maintains that the ques-

tions were highly prejudicial because the jury was allowed to believe that if Rupe were sentenced to life imprisonment without the possibility of parole, it would not mean much because his sentence could be commuted. Finally, Rupe argues that there is no power to commute a sentence because RCW 10.95.030(1) states that a defendant sentenced to life imprisonment without parole "shall not have that sentence suspended, deferred, or commuted by any judicial officer . . ."

Initially we note that, contrary to Rupe's assertion, under Const. art. 3, § 11 the Governor has the power to commute a sentence.

In *California v. Ramos,* 463 U.S. 992, 77 L. Ed. 2d 1171, 103 S. Ct. 3446 (1983), the United States Supreme Court held that no violation of the federal constitution resulted from an instruction required by a California statute, which informed a capital sentencing jury that a sentence of life imprisonment without the possibility of parole may be commuted to a sentence which includes the possibility of parole. The Court concluded that the instruction was both accurate and relevant to a legitimate state penological interest—the concern about the future dangerousness of the defendant should he ever return to society. *Ramos,* at 1001–06. Under *Ramos,* we conclude that no federal constitutional violation occurred here.

The Court in *Ramos* observed, however, that state courts are free to decide on state grounds that instruction or argument on a Governor's power to commute a sentence is improper, *Ramos,* at 1013–14, and that many state courts had held it improper for the jury to consider or to be informed through argument or instruction of the possibility of commutation, pardon, or parole. *Ramos,* at 1013 n.30. Following *Ramos,* a number of state courts have found such argument or instruction improper. On remand of *Ramos,* the California State Supreme Court held that the instruction at issue was a violation of due process under the state constitution. *People v. Ramos,* 37 Cal. 3d 136, 689 P.2d 430, 207 Cal. Rptr. 800 (1984), *cert. denied,* 471 U.S. 1119, 86 L.

Ed. 2d 266, 105 S. Ct. 2367 (1985). The court said the instruction was misleading because it did not also inform the jury that a death sentence could be commuted, and it invited the jury to consider speculative and impermissible factors in its determination.

The Illinois Supreme Court acknowledged *Ramos,* then reiterated its earlier holding that the Illinois capital sentence statute requires that the court or jury consider aggravating and mitigating factors relevant to the imposition of the death penalty; and that whether the defendant might be paroled at some future time is not a proper aggravating factor to consider. *People v. Brisbon,* 106 Ill. 2d 342, 478 N.E.2d 402, *cert. denied,* 474 U.S. 908, 88 L. Ed. 2d 241, 106 S. Ct. 276 (1985). *See also State v. Glass,* 455 So. 2d 659 (La. 1984), *cert. denied,* 471 U.S. 1080, 85 L. Ed. 2d 514, 105 S. Ct. 2159 (1985); *State v. McDonald,* 661 S.W.2d 497 (Mo. 1983), *cert. denied,* 471 U.S. 1009, 85 L. Ed. 2d 168, 105 S. Ct. 1875 (1985); *McKay v. State,* 707 S.W.2d 23 (Tex. Crim. App. 1985), *cert. denied,* ___ U.S. ___, 93 L. Ed. 2d 164, 107 S. Ct. 239 (1986).

As have these courts, we examine our own state law to determine whether the questioning about the possibility of commutation was improper.

RCW 10.95.060(3), providing for admissibility of evidence in a capital sentencing proceeding, was construed by this court in *Bartholomew* II. There, we invalidated the provision which authorized admission of evidence of the defendant's previous criminal activity regardless of whether the defendant was charged or convicted of that activity. We said the State's evidence of nonstatutory aggravating factors is admissible if it is relevant and is (1) evidence of the defendant's criminal record, (2) evidence which would have been admissible at the guilt phase, or (3) evidence to rebut matters raised in mitigation by the defense. *Bartholomew* II, at 642. We further said that admissible State's evidence includes any evidence relative to the statutory aggravating factors set forth in RCW 10.95.020, if such evidence would have been admissible at the guilt phase. *Bartholomew* II, at

643. Finally, as noted earlier in this opinion, in the event that the sentencing jury is not the same jury as convicted the defendant, the prosecution may present evidence of the facts and circumstances of the murders. *Bartholomew* II, at 643.

The only one of these categories of evidence which might be pertinent here is evidence of nonstatutory aggravating factors to rebut matters raised in mitigation by the defendant. Defense counsel inquired of Rupe, "at best, you will be looking at Walla Walla for the rest of your life", and Rupe answered "[l]ife without parole." This exchange took place in the context of testimony about Rupe's activities at the penitentiary in Walla Walla, including letter writing, foreign language study, and piano lessons. The import of the statements was that Rupe would not be a danger to anyone in the future, but would instead be a positive, productive prison inmate for the rest of his life if his sentence were life without parole.

The deputy prosecutor's questions about the possibility of commutation were apparently asked in an attempt to rebut the impression that Rupe would never, could never, be released into society. As such, the question was asked in an effort to rebut defendant's evidence of mitigation, *i.e.,* that he would not be of future dangerousness to society.

Where evidence is produced to rebut matters raised in mitigation, the evidence must meet the following balancing test:

> In our opinion, the prosecution should be entitled to produce information necessary to rebut mitigating evidence produced by defendant. Defendant's right to present mitigating evidence is limited only by the requirement of relevance. . . .
> This holding will require the trial court to evaluate the rebuttal evidence offered by the prosecution. Rebuttal evidence should be admitted only if it is relevant to a matter raised in mitigation by defendant. Evidence might be relevant, for instance, if it casts doubt upon the reliability of defendant's mitigating evidence. We do not intend, however, that the prose-

cution be permitted to produce any evidence it cares to so long as it points to some element of rebuttal no matter how slight or incidental. The court in determining whether to admit the prosecution's evidence should apply a balancing test similar to that contemplated by ER 403. The court must balance the extent to which the evidence tends to rebut defendant's mitigating information against the extent to which the evidence is otherwise prejudicial to defendant. Only if the rebuttal value of the evidence outweighs the prejudicial effect should the evidence be admitted.

*Bartholomew* II, at 642–43 (quoting *State v. Bartholomew,* 98 Wn.2d 173, 197–98, 654 P.2d 1170 (1982), *State's cert. granted and remanded,* 463 U.S. 1203, 77 L. Ed. 2d 1383, 103 S. Ct. 3530, *defendant's cert. denied,* 463 U.S. 1212, 77 L. Ed. 2d 1395, 103 S. Ct. 3548 (1983)).

Applying this test here, we conclude that the questioning about the possibility of commutation was relevant to the statements by defense counsel and Rupe. The questions served to demonstrate that "at best," Rupe might someday have his sentence commuted, contrary to defense testimony that "at best" he would be in prison the rest of his life. Information about commutation is generally not proper evidence to place before a capital sentencing jury in this state, because it is beyond the statutorily defined province of the jury to choose between two alternatives—life without the possibility of parole and death. Commutation involves a third alternative, which is solely a matter of executive grace. Where the evidence is in response to a misleading impression left by defense that the defendant will never, can never, be released into society, however, any prejudicial effect of the information does not outweigh the extent to which it rebuts matters raised by the defense in mitigation. Therefore, the trial court properly permitted the questioning about the possibility of commutation.

## XII

Rupe argues that the trial court erred by giving instructions 7 and 11 and by refusing to give certain instructions he proposed.

Instruction 7 states:

> The question you are required to answer is as follows: "Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?"
>
> If you unanimously answer "yes" the sentence will be death. If you do not unanimously answer "yes", or if you unanimously answer "no" the sentence will be life imprisonment without the possibility of parole.

Clerk's Papers, at 403. The instruction proceeds to tell the jury that it "may consider any relevant factors, including, but not limited to" the eight factors listed in RCW 10.95-.070. The factors are listed verbatim in the language of the statute.

Rupe challenges this instruction on two grounds. He first claims that the repeated use of "unanimously" compelled the jury to believe it had to be unanimous one way or the other. The instruction, however, contains all three alternatives: unanimous "yes"—death sentence; no unanimous "yes"—life without parole; and unanimous "no"—life without parole. In addition, instruction 11, objected to by Rupe on the same basis as he objected to instruction 7, states:

> You must answer one question. All twelve of you must agree before you can answer the question "yes." If all twelve of you so agree the foreperson should sign the Sentencing Verdict. If all twelve of you do not so agree or if all twelve of you agree that the answer to the question should be "no" then your foreperson will answer the question "no."

Clerk's Papers, at 407.

Instructions 7 and 11 properly informed the jury it had the option not to unanimously agree to the statutory question (RCW 10.95.060(4)). The trial court did not err in giving instructions 7 and 11. *See State v. Mak,* 105 Wn.2d 692, 757, 718 P.2d 407, *cert. denied,* __ U.S. __, 93 L. Ed. 2d 599, 107 S. Ct. 599 (1986).

Several instructions proposed by Rupe would, in his estimation, resolve the unanimity difficulty he perceives by

instructions 7 and 11. Because the court did not err in giv-
ing these instructions, however, it also did not err by refus-
ing to give Rupe's proposed instructions.

 Rupe's second challenge to instruction 7 is that by
stating the eight mitigating factors listed in RCW 10.95-
.070, instruction 7 confused the jury by referring to miti-
gating factors of which there was no evidence. We rejected
this challenge in *Rupe* I. It is well settled that the court
may instruct in the language of this statute. *See Rupe* I, at
709–10; *State v. Campbell,* 103 Wn.2d 1, 28, 691 P.2d 929
(1984), *cert. denied,* 471 U.S. 1094, 85 L. Ed. 2d 526, 105 S.
Ct. 2169 (1985).

Moreover, because instructing in the language of the
statute is adequate, the trial court did not err by refusing
to give Rupe's proposed instruction listing other factors.
Since instruction 7 informed the jury that it could consider
"any relevant factors," Rupe was able to argue any addi-
tional factors he believed to be mitigating. *Cf. Tucker v.
Zant,* 724 F.2d 882, 892 (11th Cir. 1984) (no error occurred
as a result of the trial court's refusal to list specific miti-
gating factors; sentencer must be free to consider all rele-
vant factors; defense counsel free to direct jury's attention
to specific mitigating factors).

Finally, Rupe maintains that the trial court erred by
failing to give a proposed instruction which would inform
the jury that the defendant is a competent witness whose
testimony should not be disregarded. The proposed in-
struction was clearly incorrect, however, because it states:

> The law makes the defendant a competent witness in
> this case and you have *no right to* disregard the testi-
> mony of the defendant upon the ground alone that he is
> the defendant and *stands charged with the commission
> of a crime.*

(Italics ours.) Clerk's Papers, at 339. Rupe was not, at this
stage of the proceedings, charged with commission of a
crime. He was convicted of that crime.

Also, although the court did not give a specific instruc-
tion on the defendant's competency as a witness, it did

inform the jury in instruction 1 that it should consider all of the evidence introduced by all of the parties and that every party is entitled to the benefit of the evidence. Because Rupe's proposed instruction was incorrect, and in light of instruction 1, there was no error in the court's refusal to give the proposed instruction.

## XIII

Under RCW 10.95.130(2)(a), this court must determine whether there was sufficient evidence to justify the jury's affirmative answer to the question whether the members of the jury were convinced beyond a reasonable doubt that there were not sufficient mitigating circumstances to merit leniency. The appropriate analysis is whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found sufficient evidence to justify this affirmative finding beyond a reasonable doubt." *State v. Mak, supra* at 761.

Rupe was convicted of the intentional premeditated murder of two bank tellers, as part of a common scheme or plan during the course of a robbery, for the purpose of protecting or concealing his identity. The mitigating factors he claimed are: (1) his lack of prior criminal activity; (2) that he was extremely disturbed mentally at the time of the murders; (3) his age at the time of the crime (27); (4) that he was unlikely to present a danger to others in the future; (5) that he was an accomplice to a murder committed by another and his participation was relatively minor; (6) that there are doubts about his participation in the crime that do not rise to the level of a reasonable doubt; (7) that he has functioned well in jail and will likely do so for the rest of his life; and (8) that he has strong community ties and has been a "good and/or productive member of his community in the past."

While the record shows evidence presented by Rupe in an attempt to establish claimed mitigating factors 2, 5, and 6, the jury could justifiably find from the evidence as a whole that Rupe was not extremely disturbed mentally at

the time of the murders; that he was not merely an accomplice; and that there were no doubts about his participation. From the guilt verdict by the first jury, and the death verdict by the second jury, it is apparent the juries did not likely believe these factors. *Cf. Mak,* at 762. Also, while in his testimony in this proceeding Rupe claimed to have been affected by alcohol and drugs, there were no witnesses who corroborated this claim. His age, 27, was not so young as to constitute a significant mitigating factor. Rupe's lack of any prior criminal record seems on the one hand, to be a mitigating factor. On the other hand, the jury might have believed that with his family and community background, and his lack of prior criminal activity, Rupe should have been better able than others to know about and resist engaging in criminal activity. Claimed factor 4 is also two-sided. Up until age 27, the evidence showed that Rupe had not seemed to present a danger to others. The jury may well have disbelieved any claim that Rupe would not pose a threat of danger to others in the future in light of the evidence. There is considerable evidence that Rupe functioned well in jail, claimed factor 7, and considerable evidence that he had strong community ties and had been a productive member of the Shelton community in the past, claimed factor 8. The jury could consider these to be mitigating factors, as Rupe maintained.

On the other hand, there was abundant evidence that Rupe cold-bloodedly committed these crimes for monetary gain. The jury was justified in concluding that this evidence far outweighed any mitigating factors. We hold that there is sufficient evidence justifying the jury's affirmative answer to the question posed by RCW 10.95.060(4).

Under RCW 10.95.130(2)(b), this court must next determine whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. This mandated proportionality review is a statutory requirement only. The United States Supreme Court has held that there is no Eighth Amendment requirement that an appellate

court must undertake a proportionality review upon request by a defendant sentenced to death. *Pulley v. Harris,* 465 U.S. 37, 79 L. Ed. 2d 29, 104 S. Ct. 871 (1984). Proportionality review, is however, an additional safeguard against arbitrarily imposed death sentences. *Pulley,* at 50.

The Court observed in *Pulley* that any capital sentencing scheme may produce aberrational outcomes on occasion, and that such inconsistencies are not like the major systemic defects the Court identified in *Furman v. Georgia,* 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726, *reh'g denied,* 409 U.S. 902, 34 L. Ed. 2d 163, 93 S. Ct. 89, (1972). *Pulley v. Harris, supra* at 54. The Court has repeatedly stated that there can be "no perfect procedure for deciding in which cases governmental authority should be used to impose death."'" *Pulley v. Harris, supra* at 54; *Zant v. Stephens,* 462 U.S. 862, 884, 77 L. Ed. 2d 235, 103 S. Ct. 2733 (1983); *Lockett v. Ohio,* 438 U.S. 586, 605, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978).

▄▄▄ We recently set forth the test for proportionality under RCW 10.95.130(2)(b): a death sentence must not be affirmed where death sentences have not generally been imposed in similar cases, nor where it has been "wantonly and freakishly imposed." *State v. Harris,* 106 Wn.2d 784, 798, 725 P.2d 975 (1986), *cert. denied,* ___ U.S. ___, 94 L. Ed. 2d 781, 107 S. Ct. 1592 (1987). "Similar cases" include cases reported in the Washington Reports or the Washington Appellate Reports since January 1965, where imposition of capital punishment was considered, and cases in which reports have been filed with this court pursuant to RCW 10.95.120. Under RCW 10.95.120, "[i]n all cases in which a person is convicted of aggravated first degree murder, the trial court shall" submit a report with details about the defendant and the crime. Thus, "similar cases" include cases where the defendant was convicted of first degree aggravated murder regardless of whether the death penalty was sought.

A review of the applicable opinions published in the Washington Reports and Washington Appellate Reports

decided under prior death penalty statutes reveals no excessiveness or disproportionality in Rupe's sentence.

A review of the reports filed pursuant to RCW 10.95.120, and of the applicable published opinions decided under our present capital sentencing statutes shows one case in which is found the same combination of aggravating factors found by the jury here. In State v. Rice, King County cause 85–1–01004–0 (sentenced July 21, 1986) (review pending, Supreme Court cause 52955–8), David L. Rice was convicted of murdering four members of a family. The sentencing report filed in that case pursuant to RCW 10.95.120 states that the jury found as aggravating factors (1) the protection or concealment of the perpetrator's identity, RCW 10.95.020(7), (2) multiple victims were murdered as part of a common scheme or plan, RCW 10.95.020(8), and (3) the murders were committed in the course of or furtherance of robbery in the first degree, RCW 10.95.020-(9)(a). Rice was sentenced to death.

In six other cases, two of the aggravating factors found in this case were found. In State v. Dykgraaf, Clark County cause 86–1–00111–5 (sentenced October 30, 1986), State v. Hazen, Clark County cause 85–1–00322–5 (sentenced April 16, 1986) (review pending, Supreme Court cause 52668–1), State v. Lennon, Benton County cause 84–1–00178–3 (sentenced March 6, 1985) (affirmed by unpublished opinion noted at 47 Wn. App. 1005 (1987)), and *State v. Mak, supra,* the jury found as aggravating factors (1) concealment of the crime or the protection or concealment of the perpetrator's identity, and (2) the murder was committed in the course of or furtherance of robbery. Other aggravating factors were found in State v. Dykgraaf (one victim, murder committed in the course of and furtherance of rape and of burglary, RCW 10.95.020(9)(b), (c)), State v. Hazen (two victims, murders were committed in the course of and furtherance of rape, RCW 10.95.020(9)(b)), and State v. Lennon (one victim, Lennon was an escapee, RCW 10.95-.020(2)). In State v. Dykgraaf, the State sought the death penalty; the defendant was sentenced to life without parole.

The judge noted in his sentencing report that the only juror not voting to impose a death sentence "indicated to his fellow veniremen that he had a strong philosophical opposition to the death penalty that he had not revealed during voir dire. He told other jurors at the end of the guilt phase that he would never vote to impose the death penalty." Hazen and Mak (convicted of murdering 13 people) were sentenced to death, and in State v. Lennon the prosecution did not seek the death penalty.

In *State v. Jeffries,* 105 Wn.2d 398, 717 P.2d 722, *cert. denied,* ___ U.S. ___, 93 L. Ed. 2d 301, 107 S. Ct. 328 (1986), the jury found as aggravating factors (1) the concealment of a crime, theft, and (2) multiple victims (two) were murdered as part of a common scheme or plan. In *State v. Ng,* 104 Wn.2d 763, 713 P.2d 63 (1985), the jury found that (1) multiple victims were murdered as part of a common scheme or plan and (2) the murders were committed in the course of or furtherance of robbery. Jeffries was sentenced to death, and Ng to life without parole.

Finally, in one other case where two aggravating factors found here were alleged (concealment of crime or identity and multiple victims murdered as part of a common scheme or plan or as the result of a single act) the defendant pleaded guilty and was sentenced to life without parole. State v. Defrates, Mason County cause 84–1–00120–8 (sentenced March 6, 1985) (two victims).

In these eight cases involving similar crimes, in four cases the defendant received the death sentence, in two cases the defendant was sentenced to life without parole although the prosecution sought the death penalty (and in one of these two cases the judge indicated the lone dissenting juror stated that he would not vote for the death penalty), in one case the prosecution did not seek the death penalty, and in one case the defendant pleaded guilty and was sentenced to life without parole. After reviewing the sentencing reports filed pursuant to RCW 10.95.120 and the published cases, we do not find any characteristics about Rupe's crime, nor a lack of characteristics found in similar crimes, which sug-

gest that the death penalty is excessive or disproportionate in Rupe's case.

Turning to consideration of the defendant, Rupe has no prior criminal record. There is evidence that, most of his life, he was active in his community, respected and liked by others. Rupe's background, particularly his lack of a prior criminal record, is unusual among those convicted of first degree aggravated murder. Nonetheless, consideration of his background does not lead to the conclusion that his sentence is excessive or disproportionate. The Legislature has clearly contemplated that the death sentence is appropriate for crimes such as he has committed. Simply because the majority of those eligible for the death sentence under our statutes have criminal backgrounds, or backgrounds marred by other conditions, does not mean that one who has a background like Rupe's is thereby ineligible for the death sentence.

The evidence showed that Rupe planned these murders over several months. They were exceedingly cold–blooded, calculated murders. There is nothing about Rupe or his background to excuse him from facing the consequences of his actions, nothing about him that so sets him apart from others who have or will properly face the death penalty under our sentencing scheme as to suggest that his sentence is excessive or disproportionate. Considering both the crime and the defendant, Rupe's sentence of death is not excessive or disproportionate.

Moreover, from the record it is apparent that the death sentence was not wantonly and freakishly imposed. The trial court made every effort to assure a fair and just proceeding. All possible mitigating factors were before the jury, which, in light of the evidence of the crime and Rupe's involvement, was nevertheless justified in finding insufficient mitigating circumstances to merit leniency. This court faces review of death penalty sentences with a great sense of responsibility—it is an awesome obligation. We are satisfied that the death sentence here was properly invoked under our capital sentencing scheme.

Finally, under RCW 10.95.130(2)(c), we must determine whether the sentence of death was brought about through passion or prejudice. There is simply no evidence which would support a finding that the verdict here was brought about through passion or prejudice.

Sentence affirmed.

DOLLIVER, DORE, ANDERSEN, CALLOW, GOODLOE, and DURHAM, JJ., concur.

PEARSON, C.J. (dissenting)—I dissent in this case for three reasons. First, I disagree with the majority about the propriety of the prosecutor's cross examination of Rupe on the issue of a commuted sentence. Second, I believe the State has failed to meet its burden of proof on the absence of mitigating factors. Third, I believe the imposition of the death penalty is a disproportionate sentence when compared to the sentences in other cases in this state. Each of these errors requires reversal, and the latter two require that the trial court be directed to enter a sentence of life imprisonment without possibility of parole.

## I

The majority holds that the prosecutor's cross examination of Rupe focusing on the possibility of a commuted sentence was not error. The majority bases its conclusion on the assertion that the prosecutor's questions were proper rebuttal to evidence in mitigation presented by the defense. Majority opinion, at 758–61. I believe the prosecutor's questions not only were improper but in addition were highly prejudicial.

The information that may be considered by a jury in a death penalty case is governed by statute. *See* RCW 10.95. The State may present evidence of aggravating circumstances such as those enumerated in RCW 10.95.020; the defendant may produce evidence of mitigating factors such as those enumerated in RCW 10.95.070. Generally, aggravating circumstances are aspects of the crime that make it more heinous, such as a contract killing or a multiplicity of

victims. *See* RCW 10.95.020(4), (8). Mitigating factors tend to be characteristics of the defendant that make him or her less culpable, such as severe mental disturbance or extreme youth. *See* RCW 10.95.070(2), (7).

As the majority points out, the State is not limited to presenting evidence only of aggravating circumstances: once the defendant produces evidence in mitigation, the State may offer pertinent rebuttal evidence. Majority opinion, at 760–61 (citing *State v. Bartholomew,* 101 Wn.2d 631, 642, 683 P.2d 1079 (1984) (*Bartholomew* II)). It is this right to present rebuttal evidence, the majority maintains, that justifies the prosecutor's cross examination of Rupe on the issue of commutation. Rupe's statement that he faced "life without parole" if the death penalty were not imposed supposedly carried the "mitigating" implication that Rupe would pose no threat to society because he would remain incarcerated his entire life. Majority opinion, at 761. The prosecution thus was entitled to rebut this implication.

It is incorrect, however, to characterize Rupe's statement on direct examination as mitigating evidence. Defense counsel asked, "Mitch, at best, you will be looking at Walla Walla for the rest of your life?" Rupe responded, "Life without parole." This dialogue made no reference to Rupe's propensity to violence; it merely alluded to Washington's sentencing scheme. The death penalty statute requires the jury to select one of two alternatives, death or life imprisonment without possibility of parole. RCW 10.95.030. Rupe's statement merely clarified the alternatives.

The majority's error appears to arise from a misunderstanding of the statutory mitigating factor "future dangerousness". *See* RCW 10.95.070(8). As indicated above, mitigating factors are those characteristics peculiar to the defendant that may make him or her less culpable than other persons committing similar offenses. *Bartholomew* II, at 647. A defendant may present in mitigation evidence of a passive personality or the absence of a general tendency to violence. The State in such an instance is entitled to present rebuttal evidence of defendant's aggressiveness.

This is not the situation in the instant case, however. Rupe's statement that under the statutory alternative to the death penalty he would face "life without parole" is a statement about the statutory alternative facing *all* defendants eligible for the death penalty. Rupe's statement is not evidence probative of Rupe's character or mental condition; it does not suggest traits peculiar to Rupe that distinguish him from others who have committed similar crimes. In the same vein, the testimony the prosecutor elicited from Rupe on the possibility of a commuted sentence is not evidence of Rupe's mental condition; it suggests no aggressiveness on his part. The majority's characterization of this evidence as pertaining to mitigation, then, is incorrect. As the majority concedes, the prosecutor's questions are not admissible under any other theory. Majority opinion, at 760. Therefore their admission was error.

This understanding of our statutory scheme is in keeping with other states' understanding of their statutory schemes. As the United States Supreme Court has observed, even though reference to commutation would not violate federal constitutional guaranties, such reference may run afoul of state guaranties. *California v. Ramos,* 463 U.S. 992, 1013–14 & n.30, 77 L. Ed. 2d 1171, 103 S. Ct. 3446 (1983). Illinois' capital punishment scheme, cited by the *Ramos* Court, 463 U.S. at 1013 n.30, provides a useful comparison to our own statutory scheme.

Illinois law, like Washington law, directs the jury to weigh aggravating circumstances and mitigating factors in deciding whether to impose the death penalty. Ill. Ann. Stat. ch. 38, ¶ 9–1(c) (Smith–Hurd 1979). The aggravating circumstances enumerated by the Illinois statute are similar to those set forth in Washington's statute. *Compare* Ill. Ann. Stat. ch. 38, ¶ 9–1(b) *with* RCW 10.95.020. The mitigating factors also are similar in the two jurisdictions. *Compare* Ill. Ann. Stat. ch. 38, ¶ 9–1(c) *with* RCW 10.95-.070.

In *People v. Walker,* 91 Ill. 2d 502, 440 N.E.2d 83 (1982), cited in *Ramos,* 463 U.S. at 1013 n.30, the prosecutor indi-

cated in closing argument that if the defendant received a prison sentence in lieu of the death penalty, the defendant would be "eligible for parole . . . in eleven years." *Walker,* at 513. The prosecutor's statement was not an inaccurate description of Illinois' sentencing scheme. However, the defendant argued that the prosecutor's remarks constituted reversible error because the possibility of parole was not a proper matter for the jury's consideration. *Walker,* at 513. The Illinois Supreme Court agreed, holding that under Illinois law the jury is confined to the consideration of aggravating circumstances and mitigating factors only. "By injecting the parole consideration into the penalty determination, the jury is diverting its attention from the offense and the offender, and is focusing upon a speculative possibility that may or may not occur." *Walker,* at 515; *see also People v. Brisbon,* 106 Ill. 2d 342, 367–68, 478 N.E.2d 402, *cert. denied,* 474 U.S. 908 (1985). The prosecutor's remarks thus constituted prejudicial error.

In the same way, in light of Washington's statutory scheme for imposition of the death penalty, the prosecutor's cross examination of Rupe on the subject of commutation violated our Legislature's directive. RCW 10.95 contemplates juror consideration only of the particular circumstances peculiar to the crime committed, characteristics personal to the defendant, and the two sentencing alternatives. Deliberation of the commutation possibilities facing all defendants is not within the jury's delegated authority. *Cf. People v. Walker, supra.*[1]

---

[1]The California Supreme Court has held that jury consideration of commutation is prejudicial error even when such consideration *is* part of the state's capital sentencing scheme. *See California v. Ramos,* 463 U.S. 992, 77 L. Ed. 2d 1171, 103 S. Ct. 3446 (1983), *on remand, People v. Ramos,* 37 Cal. 3d 136, 689 P.2d 430, 207 Cal. Rptr. 800 (1984), *cert. denied,* 471 U.S. 1119 (1985). A reference to commutation of a life sentence violates the principle of fundamental fairness by being misleading: it implies that the governor does not have the power also to commute a death penalty sentence.

[T]he pernicious effect of [such a one–sided reference to commutation] is that it may lead a jury that does not believe that the death penalty is necessary, but fears a future commutation, to return a death penalty in the mistaken

Moreover, even if the prosecutor's questions somehow could be construed as rebuttal, they still would be improper. This court has held that not all rebuttal evidence is necessarily admissible. *Bartholomew* II, at 642–43. In order to be admissible, rebuttal evidence must satisfy a balancing test similar to that prescribed under ER 403. The trial court must weigh the "extent to which the evidence tends to rebut defendant's mitigating information" against "the extent to which the evidence is otherwise prejudicial to defendant. Only if the rebuttal value of the evidence outweighs the prejudicial effect should the evidence be admitted." *Bartholomew* II, at 643 (quoting *State v. Bartholomew*, 98 Wn.2d 173, 198, 654 P.2d 1170 (1982) (*Bartholomew* I), *State's cert. granted and remanded*, 463 U.S. 1203, *defendant's cert. denied*, 463 U.S. 1212 (1983)). The prejudice to the defendant caused by the prosecu-

---

belief that that sentence alone will preclude any possible release. Because an accurately informed jury would at least realize that the possibility of [commutation] cannot be avoided in any event, it is less likely to return a death sentence when it is not convinced that death is warranted.

*People v. Ramos, supra* at 154.

In addition, reference to commutation is improper because it turns the jury's attention to matters that should not influence the death penalty determination. The future dangerousness of the defendant and the likelihood of a future commutation are both matters purely speculative in nature. As the Louisiana Supreme Court stated,

"When a jury's attention is . . . thrust into speculation about the future action of as yet unknown actors, a serious possibility arises that each death sentence imposed under such conditions is the result of an interjection of an unquantifiable factor into the deliberation process, thereby rendering the decision arbitrary. . . ."

*People v. Ramos*, at 157 (quoting *State v. Lindsey*, 404 So. 2d 466, 487 (La. 1981)); *see also Farris v. State*, 535 S.W.2d 608, 614 (Tenn. 1976) ("This is trial 'by guess and by golly' . . . which offends every sense of fairness and every precept of due process.").

Finally, jury consideration of a defendant's possible release into society is a violation of separation of powers principles. Under California law, as under Washington law, the power to commute a sentence is vested in the executive branch. *See People v. Ramos, supra* at 153; Const. art. 3, § 11. A jury persuaded to choose the death penalty to avoid a commutation would be preempting the executive's constitutional authority. *See People v. Ramos, supra* at 158 (citing *State v. Lindsey, supra* at 487; *State v. White*, 27 N.J. 158, 177–78, 142 A.2d 65 (1958)).

tor's questions is not insubstantial. On direct examination Rupe made a single statement that he would face "life without parole". The prosecutor, on the other hand, inquired four times of the possibility of commutation. In addition, the judge overruled defense counsel's objection to the questions, thereby suggesting the court's approval of jury consideration of the issue. *See Caldwell v. Mississippi,* 472 U.S. 320, 339, 86 L. Ed. 2d 231, 105 S. Ct. 2633 (1985) (finding prejudice to defendant in prosecutor's improper remarks, in part because "[t]he trial judge . . . not only failed to correct the prosecutor's remarks, but in fact openly agreed with them"). Other jurisdictions have recognized the prejudice inherent in the State playing on the jury's fear of future parole. For example, Louisiana has held that a court reviewing a death penalty case in which the possibility of future release was interjected into the proceedings "*must presume* that a death sentence was imposed under the influence of an arbitrary factor unless the record clearly indicates . . . the jury was . . . admonished to disregard the improper remark, and the record indicates that the jury heeded the admonition." (Italics mine.) *State v. Lindsey,* 404 So. 2d 466, 487 (La. 1981). *See also People v. Myers,* ___ Cal. 3d ___, 729 P.2d 698, 233 Cal. Rptr. 264, 277 (1987) (court aware of no case in which error such as reference to commutation "has been found non-prejudicial in a death penalty case" and court strongly doubted it "could ever confidently conclude that there was no reasonable possibility" the jury's decisionmaking process was tainted). *See generally People v. Brisbon, supra* at 367–68; *People v. Ramos,* 37 Cal. 3d 136, 156 n.10, 689 P.2d 430, 207 Cal. Rptr. 800 (1984) (noting that 25 jurisdictions[2]

---

[2]Our own court was one that recognized, in the context of jury instructions under a prior death penalty statute, that turning the jury's attention to parole possibilities can place "undue emphasis" on those possibilities. *State v. Todd,* 78 Wn.2d 362, 376, 474 P.2d 542 (1970). "By instructing the jury concerning the possible minimum sentence which the defendant might serve, the court suggests to the jury that it should give great weight to that possibility in reaching its verdict." *Todd,* at 376; *see also State v. Grisby,* 97 Wn.2d 493, 499–500, 647 P.2d 6 (1982)

at that time held jury consideration of parole, pardon, or commutation to be error, and only three jurisdictions held such consideration proper), *cert. denied,* 471 U.S 1119 (1985).

We tread on dangerous ground when we hold that a single statement by the defendant mentioning the statutory alternative to the death penalty somehow opens the door to an otherwise improper appeal to the jury's fears. The death penalty is qualitatively different from all other punishments and requires the courts to conduct a greater degree of scrutiny when a capital sentence is imposed. *California v. Ramos,* 463 U.S. 992, 998–99, 77 L. Ed. 2d 1171, 103 S. Ct. 3446 (1983). Under the federal constitution, the death penalty may not be imposed arbitrarily and capriciously, and the jury must adhere to the substantive factors state law lays before it. *Ramos,* at 999; *see People v. Walker,* 91 Ill. 2d at 515 (fact that prosecutor's improper remarks may have been invited by defendant not dispositive in death penalty case; court must use strict scrutiny and determine that jury considered only proper factors). Our state constitution requires even greater safeguards. *Bartholomew* II, at 639. "Where the trial which results in imposition of the death penalty lacks fundamental fairness, the punishment violates article 1, section 14 of the state constitution." *Bartholomew* II, at 640. Fundamental fairness is absent from any proceeding "in which evidence is allowed which lacks reliability." *Bartholomew* II, at 640.

No reliable evidence was presented to support the suggestion that Rupe's sentence might be commuted; the likelihood of commutation is virtually unascertainable. Rupe's

---

(when statute expressly required jury to consider life imprisonment with parole, instruction on parole was not error provided trial court carefully instructed jury so as to ensure no undue emphasis placed on instruction), *cert. denied sub nom. Frazier v. Washington,* 459 U.S. 1211 (1983); *State v. Music,* 79 Wn.2d 699, 709–10, 489 P.2d 159 (1971) (additional jury instructions on consequences of verdict of not guilty by reason of mental irresponsibility and of sentence of life imprisonment went beyond Legislature's intent and thus placed undue emphasis on such facts), *vacated in part on other grounds,* 408 U.S. 940 (1972).

future dangerousness is equally speculative. Scientific studies have laid to rest the idea that future dangerousness can be predicted with any degree of certainty. *People v. Ramos,* 37 Cal. 3d at 156. Furthermore, if Rupe's statement that at best he faced "life without parole" justified the prosecutor's references to commutation, the statement also would appear to justify questions about the possibility of, for example, federal habeas corpus relief. Such relief could occur, if not in the immediate future, then in 5 or 10 years, when the United States Supreme Court might decide to create new constitutional standards. Or perhaps "life without parole" could end with the release of prison inmates due to overcrowding or other intolerable prison conditions, at the behest of some as yet unappointed federal judge. Even if we lacked our statutory prohibition to jury consideration of these matters, our state constitution would not allow death penalty determinations to be based on such unchanneled speculation.

## II

Two additional reasons compel reversal: the State's failure to prove the absence of mitigating factors, and the disproportionality of Rupe's sentence when compared with the sentences in similar cases. But unlike the error in questions regarding commutation, these two errors preclude a second sentencing hearing and instead require imposing a sentence of life imprisonment without possibility of parole.

Whenever a defendant is sentenced to death, our court is statutorily required to review the sentencing procedure and outcome. RCW 10.95.100. Regardless of what other issues the defendant may raise, the mandatory review specifies three express inquiries:

(a) Whether there was sufficient evidence to justify the affirmative finding to the question ["Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?"]; and

(b) Whether the sentence of death is excessive or dis-

> proportionate *to* the penalty imposed in similar *cases,* considering both the crime and the defendant. . . .
> . (c) Whether the sentence of death was brought about through passion or prejudice.

RCW 10.95.130(2); *see* RCW 10.95.060(4).

Each of these questions is distinct from the others. The inquiry in (a) focuses on the defendant and the crime and asks the question: are there facts about the defendant's character and facts about the crime that militate against imposing the most severe of penalties? The burden of proof is not on the defendant but on the State; the State must prove that whatever mitigating facts do exist are out-weighed by the particular aggravating circumstances *in the* case. *See State v. Mak,* 105 Wn.2d 692, 755, 718 P.2d 407, *cert. denied,* 107 S. Ct. 599 (1986).

The inquiry in (b), whether the sentence is dispropor-tionate, asks: even if the defendant can be said to deserve the death penalty, does such a sentence constitute a signifi-cant departure from the sentence generally imposed on other defendants in similar circumstances? An otherwise appropriate sentence of death will be reversed if one defendant is treated more harshly than other defendants of similar character who have committed similar crimes.

The third inquiry, whether the death penalty was brought about "through passion or prejudice", is concerned more with the jury's means of arriving at the sentence than at the sentence itself. I do not believe the record suggests anything improper in the jury's motivation and process. The first two inquiries, however, are problematic.

The inquiry under (a), as indicated, focuses on whether the aggravating circumstances of the crime outweigh the mitigating aspects of the defendant's character or mental state. RCW 10.95.070 sets forth examples of mitigating fac-tors, two of which are relevant here: (1) whether the defendant has a significant history of prior criminal activ-ity; and (2) whether the murders were committed while the defendant "was under the influence of extreme mental dis-turbance". RCW 10.95.070(1), (2). The evidence is undis-

puted that Rupe had no history of prior criminal activity. *Cf. State v. Harris*, 106 Wn.2d 784, 799, 725 P.2d 975 (1986), *cert. denied*, 107 S. Ct. 1592 (1987). Not only does this fact, standing alone, argue in favor of leniency, but in addition it speaks to the second factor, Rupe's mental state. Before examining the meaning of "extreme mental disturbance", however, the undisputed evidence bearing on Rupe's background merits discussion.

Approximately 50 people testified on Rupe's behalf at his sentencing hearing. They were childhood friends, friends of Rupe's parents, high school friends, and co-workers who served with Rupe in the army or on various community volunteer projects. The testimony was corroborative, not conflicting, and the picture of Rupe that emerged was uncontested: prior to the crime he had been—throughout his life—an even-tempered, likeable, helpful, kind, and law-abiding person.

As a child, Rupe played well with other children. He demonstrated no violent tendencies, and he "really liked people". When he was younger, he was a cub scout. In junior high school he was active in football and track; in high school he was team manager in several sports. He participated in the drama club, the debating club, and an exchange student program. He had many friends and was never known to be rowdy or violent.

When Rupe was only a young teenager he became active in Explorer Scouting—an extension of Boy Scouts—and joined the Civil Air Patrol. These activities taught him, among other things, skills useful in search and rescue operations. By the time he was 16, he had joined seven search and rescue missions. Rupe subsequently became a charter member of the Mason County Search and Rescue Council, an organization whose primary purpose was coordinating the activities of a large number of search and rescue groups. A number of years later, after joining the army, Rupe and a co-worker set up a ground search and rescue program in South Carolina.

Rupe's childhood ambition had always been to join the

military service. When he was still in high school but had turned 17, he obtained his parents' permission to sign up for a 3-year tour of duty in the army. A bad ankle and arthritis kept him out of the military police, so he took an assignment in electronics signal duty. He served in New Jersey, South Carolina, and Korea, working on computer communications. He rose from repairman to Specialist 5th Class, and held positions as Assistant Shift Supervisor and Field Trip Supervisor. He was on temporary duty with the White House Communications Agency and spent 2 weeks at Camp David.

Rupe's military career included serving in Thailand, Taiwan, and Viet Nam; in the latter instance, he worked on removing electronic equipment just prior to the military pull-out. He was also stationed in Germany where he was the maintenance chief in charge of seven sites. During his first 3 months in Germany Rupe worked 7 days a week, often 16 to 17 hours a day. Although he was not enamored with every aspect of his job, he was happy in his work.

Throughout the period of his military career Rupe continued to be known as a gentle person who was willing to lend a hand to others. When he visited with friends, he enjoyed playing with their children, and the children responded with affection. Many of Rupe's friends considered him a member of their families.

Rupe's 8½ years of productive military service came to an abrupt end in December 1980. New army regulations required Rupe to reduce his weight by more than 80 pounds. He managed to lose 71 pounds, but was unable to shed an additional 10. Rupe was honorably discharged and, for the first time since high school, Rupe was a civilian.

Rupe's civilian life proved less rewarding than his military career. Due to a civilian hiring freeze he was unable to find work that would exploit the skills he had learned in the army. Three months after his discharge he enrolled in Olympia Technical Community College. He also took a half-time position as a security officer at the college. In mid-September, Rupe felt the stress of financial problems.

He was unsure of his long–term goals, his job, and his schooling. He was drinking heavily and taking amphetamines. It was at this time he thought of robbing the Tumwater State Bank.

There can be no question that Rupe's thoughts turning to bank robbery and murder represent a marked deviation from his prior personal history. He had never before committed a crime. Everyone who knew him—whether during his childhood, teenage years, or military career—considered him a gentle, friendly person, someone who went out of his way to help others. It is difficult to imagine this good friend and citizen pointing a gun at Candace Hemmig and Twila Capron and shooting them to death. But it is impossible to imagine this scene without believing that Mitchell Rupe was acting under the influence of an extreme mental disturbance.

I do not mean to suggest that Rupe was insane at the time of the murders. However, as an examination of the death penalty statute will reveal, a person need not be even "nearly" insane to be considered to suffer from an "extreme mental disturbance".

To understand the statutory language "under the influence of extreme mental disturbance", we first must recognize that RCW 10.95.070 contains more than one factor pertaining to the defendant's state of mind. Subsection 6 identifies as a mitigating factor evidence that, "at the time of the murder, the capacity of the defendant to appreciate the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of law was substantially impaired as a result of mental disease or defect". RCW 10.95.070(6). This provision is similar to Washington's insanity defense. See RCW 9A.12.010. However, RCW 10.95.070, unlike the insanity defense, is not concerned with whether the defendant should be held responsible for the crime. "[Mitigating circumstances are those which] do not constitute a justification or excuse of the offense in question, but which, in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability."

(Brackets in original.) *Bartholomew* II, at 647. A jury has already determined the defendant is legally accountable; the question raised by RCW 10.95.070(6) is to what extent the defendant should be punished. The Legislature, then, in enacting subsection 6 contemplated a situation in which the defendant's mental state was not sufficiently impaired so as to render him legally innocent but yet still was sufficiently impaired so as to mitigate the severity of his punishment.

If a subsection 6 "mental disease or defect" does not rise to a level requiring acquittal, then similarly a subsection 2 "extreme mental disturbance" does not rise to the level of a subsection 6 substantial impairment. In other words, the subsection 2 "extreme mental disturbance" is not the kind of mental impairment so serious as to be considered a "disease or defect" that would suggest acquittal or even just leniency under RCW 10.95.070(6).

Rupe's commission of the murders presented a sharp break with his past conduct. By all accounts—and the evidence was overwhelming—he had been an ordinary, law-abiding, and sympathetic person. The crime itself illustrated Rupe's mental disturbance: he left his checkbook at the scene, and soon after he actively sought to assist the police investigating the crime. He gave inconsistent stories, confessed several times to the police, and confessed to his friends. He then mounted an alibi defense that strains credulity, particularly in light of his inconsistent stories and the admission at trial of his confessions. It is impossible to review the evidence in this case without concluding that the person committing these murders lost some of his grip on reality.

Although the evidence demonstrates Rupe's extreme mental disturbance, this mitigating circumstance must be weighed against the aggravating factors. Of the three aggravating factors in this case, only one concerns human suffering: the multiplicity of victims. The other factors, that the murders were committed in the course of a robbery and to conceal the perpetrator's identity, did not increase the

quantity of human misery and death.

This case does not evidence many of those aggravating factors which do increase the human suffering. The victims were not tortured, nor were they subject to the vicious brutality marking other crimes. *See State v. Campbell,* 103 Wn.2d 1, 5–6, 691 P.2d 929 (1984), *cert. denied,* 471 U.S. 1094 (1985); *see also* cases discussed in *State v. Harris, supra,* 106 Wn.2d at 803–04 (Utter, J., dissenting) (in one case defendant kicked victim in face, badly breaking nose, shot victim four times in head, and stomped victim's chest in; in second case, victim "had been badly beaten and had been strangled", victim's neck broken, victim had been shot twice, and he was discovered with his slacks "below his knees, the zipper and catch undone and his belt torn open . . . [h]is hands and feet . . . bound with telephone cord and strapping tape"; in neither case was death penalty sought). The killings here occurred in a single episode; we are not faced with a serial killer whose mental disturbance led to successive murders. Finally, the murders did not manifest the cold, chillingly calculated state of mind we saw in the Wah Mee case, where 14 people were methodically hog–tied and shot. *See State v. Mak,* 105 Wn.2d 692, 697, 718 P.2d 407, *cert. denied,* 107 S. Ct. 599 (1986). The cool–headed perpetrators of the latter crime were not likely to have left incriminating identification, such as a checkbook, at the crime scene.

It is conceivable that if the Mitchell Rupe of years ago had re–emerged at trial and displayed horror and remorse for these murders, his mental disturbance would have elicited more sympathy from the jury. But the fact that Rupe's mental disturbance appears to have persisted—evidenced in part by his senseless adherence to the alibi defense— does not alter the fact that that mental disturbance existed during commission of the crime.

The Legislature intended that the sentence of life imprisonment without possibility of parole be reserved for those crimes so grievous that their perpetrators have relinquished all right to liberty for every remaining moment of

their lives. Mitchell Rupe will never again experience a day outside prison, and no argument is made that he should, for he deprived two human beings of life entirely. However, I believe the Legislature reserved the death penalty for those persons who not only have committed grievous crimes but also who have little to offer in way of mitigation. I do not believe the death penalty was designed for crimes as aberrant as this one: where an ordinary citizen suddenly acts in a manner inconsistent with his entire personal history and commits a sudden, confused, and single brief episode of violence. Where no torture, viciousness, or sadism is present, where the murders are not part of a string of killings by a serial murderer, where the deaths were not carried out with cold and systematic calculation, a defendant's extreme mental disturbance must weigh heavily in mitigation. Thus, even when one examines the evidence in a light most favorable to the State, the State cannot be said to have proved, beyond a reasonable doubt, that leniency is unwarranted.

Finally, this death sentence requires reversal because it is disproportionate to the sentences meted out in similar cases. As I noted *ante,* the review of a sentence for proportionality is a separate and distinct inquiry from the review of mitigating factors. Under the proportionality review, we assume for the sake of argument that the evidence in mitigation was insufficient to require leniency; we focus instead on whether other defendants in similar cases also received the same penalty.

This court has failed to set forth a satisfactory methodology for conducting a proportionality review. Admittedly, even a cursory examination of the 45 other cases of aggravated first degree murder brought under the current death penalty statute reveals a multitude of combinations of mitigating factors and aggravating circumstances which makes meaningful comparisons difficult. However, some comparisons are possible.

One approach is to begin by classifying a case in terms of its salient aggravating factors. A murder committed in the

course of a robbery would be compared with other robbery–murders; a theft–murder would be compared with other theft–murders. Once the appropriate set of defendants is identified for comparison, the comparison would be for special heinousness and for factors in mitigation. Certain facts would indisputably increase the heinousness of a crime: if there was more than one victim, if the victim was conscious for any significant length of time of his or her impending death, and if the victim was physically abused or tortured. Certain facts in mitigation also are indisputable: serious mental impairment and emotional disturbance. When all other factors are equal, defendants who do not torture their victims should not receive the death penalty if those who do torture their victims consistently receive a prison sentence. Defendants who have committed a single murder should not receive worse treatment than those committing multiple murders. Moreover, these sets composed of various aggravating circumstances should be compared one to the other. For example, all else being equal, defendants whose aggravating circumstance was first degree robbery should not be treated worse than defendants whose aggravating circumstance was first degree rape, for the Legislature had defined first degree rape as a more serious offense.[3] *See* RCW 9.94A.320 (setting forth "seriousness" levels for offenses under the sentencing reform act).

In the instant case, the defendant committed the murders in the course of a first degree robbery. There were two victims, a factor that enhances the heinousness of the crime. There was essentially no conscious suffering by the victims and no torture. As a factor in mitigation, the defendant acted under the influence of an extreme mental disturbance.

Examination of the 45 other cases of aggravated first

---

[3]In examining the special circumstances in death penalty cases, we have a substantial record before us, but in comparing death penalty cases to those in which the death penalty was *not* imposed we are limited to the facts elicited from the trial court by this court's standard questionnaire. *See* RCW 10.95.120(1)–(4).

degree murder yields 4 in which the defendant acted in the course or furtherance of a first degree robbery and killed multiple victims: *State v. Mak, supra; State v. Ng,* 104 Wn.2d 763, 713 P.2d 63 (1985); State v. Strandy, Clark County cause 85-1-00487-6 (sentenced October 4, 1985); State v. Hazen, Clark County cause 85-1-00322-5 (sentenced April 16, 1986).[4] Two defendants—Mak and Hazen—received the death penalty; the other two did not. Unlike Rupe, all four of these defendants inflicted conscious suffering on their victims, making their crimes the more heinous. Two of the defendants—Ng and Hazen—offered some evidence of psychological disorders, but Ng, who participated in the execution-style slaying of 13 persons, was spared the death penalty. Strandy, who also was spared the death penalty, had no apparent mental disorder; in addition, he had a prior history of burglary, first degree robbery, and prison riot.

Even if we ignore a systematic approach to the proportionality review, we cannot help but recognize that Rupe's case presents an odd contrast with the cases of other defendants on death row. In five of these cases the defendants were convicted of killing more than one victim. *See State v. Campbell,* 103 Wn.2d 1, 691 P.2d 929 (1984), *cert. denied,* 471 U.S. 1094 (1985); *State v. Mak, supra; State v. Jeffries,* 105 Wn.2d 398, 717 P.2d 722, *cert. denied,* 93 L. Ed. 2d 301 (1986); State v. Hazen, *supra*; State v. Rice, King County cause 85-1-01004-0 (sentenced July 21, 1986).[5] In all but one of these five cases—*Jeffries*—there was substantial conscious suffering prior to death. *Jeffries* may be explained by the fact that there was no evidence of mental disturbance; in addition, the defendant had an

---

[4]The sentence in this case has not yet been reviewed by the Supreme Court, and my remarks here should not be construed as any prejudgment of the issues in the case.

[5]The sentence in this case has not yet been reviewed by the Supreme Court, and my remarks here should not be construed as any prejudgment of the issues in this case.

extensive criminal history spanning almost 20 years and containing 15 convictions. In two other cases—Hazen and Rice—there apparently was evidence of mental disturbance. However, these cases also appear to show some differences from Rupe's. Hazen had committed not only a first degree robbery but also a first degree rape, a more serious offense under the sentencing reform act. Rice's crime had four victims and was marked by serious brutality.

It is difficult to reconcile many of these differences. Ng killed 13 persons who lay hog–tied knowing they were about to die. Strandy also tied and gagged his victims. Neither of these defendants received the death penalty, and Strandy gave no signs of any mental disturbance that would lessen his culpability. Rupe's case differs from similar cases on death row in that the victims in these cases suffered prior to their deaths. Moreover, the other cases generally gave no suggestion of mental disturbance on the part of the defendant. Rupe's case is the sole case in which the victims did not suffer prior to death *and* the defendant acted under the influence of an extreme mental disturbance. Just as the murders in this case were wanton and freakish in light of Rupe's entire personal history, so the imposition of the death penalty is wanton and freakish in light of the treatment of other defendants.

For these reasons I dissent.

WILLIAMS, J. Pro Tem., concurs with PEARSON, C.J.

Reconsideration denied November 24, 1987.