FILED
COURT OF APPEALS
DIVISION II

2015 FEB 10 AM 8: 57

STATE OF WASHINGTON

BY_____
DEPUTY

## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 45195-6-II |
| Respondent, | |
| v. | |
| EARL DEMITRUIS BURNS, | UNPUBLISHED OPINION |
| Appellant. | |

SUTTON, J. – Earl Demitruis Burns appeals his jury trial conviction for assault in the second degree. He argues that the trial court erred in denying his for-cause challenge to one of the jurors and that the State engaged in prosecutorial misconduct in closing argument by shifting the burden to the defense, arguing facts not in evidence, denigrating a witness, and expressing personal opinion about a witness's credibility. In a pro se Statement of Additional Grounds[1] (SAG), he argues that his trial counsel provided ineffective assistance by failing to use a peremptory challenge to excuse the juror that the trial court refused to dismiss for cause and that the trial court was biased. We affirm.

## FACTS

### I. THE ASSAULT

Burns intermittently lived with Latonia Antoinette Sharpley during their 11-year dating relationship. Sharpley and Burns had two daughters together. During the later portion of this

---

[1] RAP 10.10.

relationship, Burns was also seeing Megan Rose. Burns and Rose had a son together; their child was five months old in June 2012.

At about 8:00 AM on the morning of June 29, 2012, Sharpley was texting someone while in bed with Burns. Suspecting that Sharpley was communicating with another man, Burns grabbed her phone and shut himself in the bathroom. When he emerged from the bathroom, Burns asked Sharpley, who was holding Burns' son, if she had been communicating with her former boyfriend. When she told him she had not been, he told her he would "beat [her] *ss" if she was lying. 1 Verbatim Report of Proceedings (VRP) at 35. Burns then compared information on Sharpley's phone with the contact information in his own phone and discovered that she had been communicating with her former boyfriend.

Burns then climbed onto the bed, took his son from Sharpley's arms and put him to one side, and struck Sharpley several times in the face. After Burns stopped hitting Sharpley, he then demanded that she go downstairs and put ice on her face. While downstairs, Sharpley climbed out of a bathroom window and sought help from a lawn maintenance crew working nearby. A neighbor called 911. Burns left Sharpley's house before the police arrived.

Sharpley was transported to the hospital. Sharpley's eyes were swollen shut, she suffered a hemorrhage in the back of her right eye, and one of her teeth had been knocked out. She gave a written statement at the hospital, and the police took photographs of her injuries. A police detective later contacted Sharpley and interviewed her.

## II. Procedure

The State charged Burns with assault in the second degree and alleged that this was a domestic violence incident.[2] Burns presented an alibi defense, claiming to have been with Megan Rose at the time of the assault.

### A. Voir Dire of Juror 22

During the voir dire of the prospective jurors, the parties questioned "Juror 22" at length about his ability to remain fair and impartial in light of his personal experiences and his relationship with law enforcement officers.

#### 1. Law enforcement officers

The State first questioned Juror 22 about his connections to law enforcement. Juror 22 stated that he knew two law enforcement officers, that one of his neighbors was a retired Tacoma Police Department detective, and that he had occasionally talked to these officers about their cases. When the State asked Juror 22 if there was anything about his relationships with these officers that led him to think he could not be fair and impartial in this case, Juror 22 responded, "Well, I'm not really sure." VRP (Voir Dire) at 43. The State then told Juror 22 that he was not being asked to ignore his life experiences but that the trial court and counsel needed to know if he could decide the case based on the evidence presented without allowing his experiences to impact his decision. Juror 22 responded that he could decide the case based on the evidence.

---

[2] RCW 9A.36.021(1)(a); RCW 10.99.020(5)(b).

Defense counsel later asked all of the jurors whether they thought that law enforcement or medical professionals, "have more built in credibility than civilian witnesses" or the defendant. VRP (Voir Dire) at 93. Juror 22 responded:

> The way I feel, I have known a lot of officers. Sometimes you can believe them; sometimes you can't. Okay. If they have to take down all the facts for the case, so they have to do research on it to put somebody in jail—and nurses or doctors, they go by what the wounds are by a person. So the credibility on them is good.
>
> [DEFENSE COUNSEL]: More so than my client or any other civilian witness?
> JUROR 22: Correct.
> [DEFENSE COUNSEL]: And that's by virtue of their job?
> JUROR 22: Right.

VRP (Voir Dire) at 94.

### 2. Personal experiences

The parties also questioned Juror 22 at length about the effect of his personal experiences on his ability to remain fair and impartial. First, when the State asked the jurors whether they or someone close them had personal experience with domestic violence, Juror 22 responded that he had been robbed and struck in the face when he was working at a convenience store and that his former wife had been raped in the same store. The perpetrators of these crimes were strangers.

When the State asked Juror 22 if those experiences would make it hard for him to "sit . . . and listen . . . to this case," Juror 22 responded that it would depend on what kind of case this was and what type of abuse was at issue. VRP (Voir Dire) at 50. The State told him it was an assault case, and Juror 22 responded that he had also been physically assaulted. The State asked Juror 22 if he thought this would impact his ability to be fair and impartial if seated on the jury. Juror 22

responded, "I could try to be impartial." VRP (Voir Dire) at 51. Juror 22 also stated that he "would try" to decide the case based solely on the evidence. VRP (Voir Dire) at 51.

After the State finished questioning other jurors, defense counsel questioned Juror 22:

[DEFENSE COUNSEL:]    Juror No. 22, I believe that in response to [the State's] questions about whether or not you thought you could be fair and impartial, your response was you could try to be impartial; is that right?
JUROR 22:    Yes.
[DEFENSE COUNSEL]:    How about fair?
JUROR 22:    I could be as fair as I can.
[DEFENSE COUNSEL]:    I don't know what that means.
JUROR 22:    Well, I could be fair.
[DEFENSE COUNSEL]:    Well, it's okay.  Tell me what you meant by that.
JUROR 22:    You know, I could be as fair as I could.
[DEFENSE COUNSEL]:    Fair as you could given the nature of the allegations in this case?
JUROR 22:    Correct.
[DEFENSE COUNSEL]:    So if it wasn't a [domestic violence] case or a [domestic violence] allegation or an assault allegation, you believe you could be— more likely to be fair?
JUROR 22:    Correct.
[DEFENSE COUNSEL]:    Is that fair to say?
JUROR 22:    Correct.
[DEFENSE COUNSEL]:    And this is where it gets difficult, and this is for everybody who is sitting here:  I am going to try and ask you to predict the future as to what your brain is going to do, should you be on this jury.  And that's really not easy, but it's the only thing I can do at this point.  So having said that, it is an assault case.  There are going to be pictures.
JUROR 22:    Okay.
[DEFENSE COUNSEL]:    Is that going to make it difficult, if not impossible, for you to be both fair and impartial?
JUROR 22:    I have seen some pretty gruesome pictures.
[DEFENSE COUNSEL]:    Okay.  But you weren't necessarily sitting on a jury in that case?
JUROR 22:    No.
[DEFENSE COUNSEL]:    In this case, you are going to be sitting on a jury ultimately making a decision about whether or not the State has proved this case against Mr. Burns.
JUROR 22:    You are making it difficult on me.
[DEFENSE COUNSEL]:    I'm not trying to.  I'm really not trying to.

> JUROR 22: When you put in perspective another person and his—for his freedom or not, it's really hard for me to say. I am looking at fairness to him. Okay. Like I say, I have seen some really gruesome pictures of people being hurt.
> [DEFENSE COUNSEL]: But you weren't on their jury?
> JUROR 22: No.
> [DEFENSE COUNSEL]: And I understand that all of us as human beings try as hard as we can. And, again, the difficulty is both for Mr. Burns, myself, and [the State], is trying to figure out—not will you try because we believe that you will try—is can you. And that's just a gut thing that only you can probably answer. You want to think about it, and I will come back to you.

VRP (Voir Dire) at 62-64.

Defense counsel then questioned other jurors. One of these jurors discussed how her experiences involved her relatives but noted that this case was not about people to whom she was related. The juror was, however, already becoming upset by the situation, and she ultimately concluded that she could not be fair and would probably "shut down" when the evidence was presented even though the case did not involve family members. VRP (Voir Dire) at 65. The parties agreed to dismiss this juror for cause.

Defense counsel then returned to Juror 22. Juror 22 noted the other juror's responses and recognized that the person who had assaulted him (Juror 22) was a stranger. But he also stated that he did not know the defendant and was not sure he could say whether he could be impartial towards the defendant. Defense counsel stated that she would come back to Juror 22 and proceeded to question the other jurors.

The next day, when defense counsel called on Juror 22 again, Juror 22 stated:

> For me to logically say I can give you a positive answer on his outcome, I cannot. And I knew you were going to get back to me. I thought about this all last night, and I want to be fair to this gentleman here. And I really can't be.

VRP (Voir Dire) at 121.

Defense counsel moved to excuse Juror 22 for cause. VRP (Voir Dire) at 121.

The State then asked some follow-up questions:

[THE STATE]:     Why do you think that you can't be fair?

JUROR 22:   I have—you know, I have been robbed by gunpoint and knife. I am more afraid of a knife. But when you get hit in the face, I have had broken ribs, you start thinking, you know, I have seen these people. And if I came up against them in court, I would have to say, hey, it was an abuse, you know. I can't—I don't know you. You might be a fantastic guy, and I hope the Lord is on your side. Okay. But I can't say I am going to be able to really give a good outcome for him.

[THE STATE]:     We are not looking for a specific outcome. We are not looking for a good outcome. What we are asking you to do—obviously, your experience dealt with strangers. This case will not be about strangers. This will be about two people that know each other. Obviously, the defendant has had no interaction with you. You don't know him.

JUROR 22:   Correct. No.

[THE STATE]:     So you can separate out the fact that you had these past experiences that have nothing to do with the defendant?

JUROR 22:   Correct.

[THE STATE]:     So the question is: Given that you have had those experiences, not related to the defendant, if we seat you on this panel, could you decide the case based on the evidence you heard and the testimony you heard?

JUROR 22:   I possibly could, yes.

[THE STATE]:     That's what we are asking, if you could do that knowing it's not related to your other experiences. Could you put those aside and decide this case solely based on what you heard through testimony and exhibits in this courtroom?

JUROR 22:   If it's two different people, yeah.

[THE STATE]:     It's people that you don't know?

JUROR 22:   Correct.

[THE STATE]:     It's people that have had no interaction with you?

JUROR 22:   Correct.

[THE STATE]:     Certainly people that have not assaulted you or robbed you, right?

JUROR 22:   Correct. You haven't robbed me, did you?

[THE STATE]:     So that's what we are talking about. Can you do that?

JUROR 22:   Yeah.

VRP (Voir Dire) at 121-23. Following this questioning, the State objected to Burns' request to excuse Juror 22 for cause.

Defense counsel then asked Juror 22 whether it was his gut reaction that he could not be on the jury and be fair and impartial. Juror 22 responded:

> Well, I want to be impartial. I want to be a juror that can be impartial, okay. I don't know if I can separate myself from what happened to me or what he did or is accused of doing. Sorry.

VRP (Voir Dire) at 123. Defense counsel then asked the juror if he knew he could not be impartial or just did not think he could be impartial. The juror responded, "I don't know if I can." VRP (Voir Dire) at 124. Defense counsel renewed the motion to excuse for cause.

The trial court denied the motion to excuse Juror 22. Juror 22 served on the jury.[3]

### B. Trial Testimony

At trial, the State presented testimony from Sharpley; the officer who responded to the 911 call; the detective who took a statement from Sharpley; and medical personnel. Burns' only witness was his alibi witness, Rose.

Sharpley testified about the assault as described above. In addition, she testified that at one point Burns had kicked her in the back and that Burns' cousin was sleeping on the couch in the living room at the time of the assault; details that were not present in her previous statements to the police. She also testified that she had not mentioned to the police that she had been holding Burns' son immediately prior to the assault. Sharpley explained, however, that her testimony was

---

[3] Burns did not exercise all of his peremptory strikes.

more detailed than the written statement she gave at the hospital because she had been in pain and could not see well when she wrote the statement, so she "just [wrote] the basics." 1 VRP at 46.

Tacoma police officer Wayne J. Beals testified that when he contacted Sharpley on the morning of the assault, she told him that Burns had become angry with her after looking at her phone and had punched her four times in the face with a closed fist. She also told Beals that she had fled the house and that Burns had left the house in his pickup truck. Beals did not, however, recall Sharpley telling him that Burns had taken her phone into the bathroom to examine it or that Burns had told her that he was going to beat her. Tacoma police department detective Eric D. Kothstein interviewed Sharpley a few days after the assault. He testified that she described the assault consistent with the facts set out above but she did not mention the child being present, Burns having kicked her, or someone else being in the house during the assault.

Rose testified that Burns was currently her boyfriend and that they were living together. When defense counsel asked her how long she had been in a relationship with Burns, Rose responded, "Officially for about ten months."[4] 2 VRP at 42. Defense counsel then asked Rose how long she and Burns had been together "unofficially";[5] she responded that they had been together about three years. She also admitted that she had been seeing Burns while he was still involved with Sharpley.

Rose testified that at the time of the assault, she was living with Burns' mother and that Burns was primarily staying with Sharpley, although he would occasionally stay with her (Rose).

---

[4] The trial took place in late June 2013.

[5] 2 VRP at 42.

2 VRP at 44. Rose asserted that Burns was staying with Sharpley because it was the only way he could see his daughters "without any drama." 2 VRP at 44.

When defense counsel asked Rose if she recalled anything about June 29, the date of the assault, Rose testified that between 11:00 AM and 1:00 PM, Sharpley arrived at his mother's house and told Rose that he had caught Sharpley cheating on him and that he needed to get away. She stated that he spent the night with her. Rose testified that they awoke about 8:00 AM the next morning.[6] 2 VRP at 45.

Defense counsel then asked Rose to clarify whether she was talking about the night of June 28 to June 29, or June 29 to June 30. Rose clarified that she was talking about June 28 to June 29. When defense counsel asked Rose why she remembered the specific night, Rose responded, "Because based off the information that I know of the situation is that this situation apparently occurred early morning on the 29th, so it had to have been the 28th to the 29th." 2 VRP at 45. On cross-examination, Rose admitted that she had determined that Burns was with her on the night of June 28 to June 29 based on information that Burns had given her around the time he was charged. She admitted that she had not told the police or the prosecutor's office about Burns having been with her at the time of the assault.

Additionally, although Rose initially testified that Burns had told her that his cousin had dropped Burns off at his mother's apartment, she later admitted that she had told a defense investigator that Burns had arrived at her house in his truck. 2 VRP at 46, 57. She later testified,

---

[6] Burns states in his brief that Rose testified that Burns told her that Sharpley was "'blowing his phone up with text messages' and calling him about something." Br. of Appellant at 9 (quoting 2 VRP at 45). But the trial court struck this portion of Rose's testimony following the State's hearsay objection, so we do not consider it.

however, that she did not see Burns arrive, so she did not see his truck. 2 VRP at 58. She also testified that she did not pick up her son until June 29, after she heard that "there may be an issue." 2 VRP at 46.

## C. Closing Argument

### 1. State's closing argument

In closing argument, the prosecutor emphasized that this case came down to whether the jury believed Sharpley or Rose. The prosecutor reminded the jury that it had been instructed that it was the sole judge of credibility. But he also told the jury that when evaluating credibility, it could look to the reasonableness of the testimony, whether the witness was biased, and whether the witness's story was "reasonable given the context." 2 VRP at 85.

The prosecutor then asked the jurors to closely examine Sharpley's and Rose's testimonies. He commented on Sharpley's testimony, her essentially consistent statement to the detective, and the fact she was visibly upset while testifying about the assault. He then contrasted this with Rose's testimony and asserted that Rose's testimony was internally inconsistent on several points. For instance, the prosecutor argued that Rose's claim that Burns and Sharpley were not dating and that Burns was just staying with Sharpley so he could see his daughters was inconsistent with Rose's testimony that he had reacted badly when he found out that Sharpley was involved with another man. The prosecutor also noted that Rose's story became "confused" when she testified about when Burns was with her, that Rose had concluded that Burns was at her house the night before the incident solely because that was when Burns had told her the assault had occurred, that it would not have made sense for Rose to leave her child with Sharpley if there had been a problem,

and that Rose's testimony about how Burns arrived at his mother's residence was not consistent.

2 VRP at 88.

The prosecutor then argued that Rose was biased and had a reason to provide alibi testimony for Burns:

> Now, let's look at another thing you have to look at is [bias] or motive. Does a witness have a bias or motive to give the story they are giving? Well, let's talk about Ms. Rose's relationship with the defendant. What you heard is that the relationship is, quote, unofficial in her own words for a period of two years. That includes up to the point of this incident. At the time of this incident, they are having a, quote, unofficial relationship, but Ms. Rose knows about Ms. Sharpley. And at the time, the defendant is spending time at both houses, back and forth, as you heard. But their relationship is unofficial.
> *Incident comes out, the defendant is charged, now it's official. Now they have an official relationship, her words, her testimony. The relationship status has changed because of this case. It has now become official. He is down to a one woman man.*

2 VRP at 91-92 (emphasis added). Burns objected, asserting that this argument did not reflect the testimony. The trial court overruled the objection. The prosecutor then argued that because Burns and Rose were now living together, Rose did not want to see him get in trouble and she was biased. 2 VRP at 92.

The prosecutor further argued:

> As you look at the stories that you have been presented and the evidence that you have been presented, the evidence supports Mrs. Sharpley's version of events. And as you are evaluating the evidence, what I want you to ask yourself is this: How did this happen? This is not an accident. You heard her describe her pain level as a nine out of ten or an eight out of ten. Ten being the worst she has ever felt in her life. She didn't hit herself. She didn't beat herself until her eye closed shut and then knocked a tooth out. The photos are there. And *there is no other explanation* for—

2 VRP at 93-94. Burns interrupted with an objection, arguing that this argument was shifting the burden. Burns elaborated, "I have no obligation to prove how this happened. [The State] has to

12

prove. And I think by going down this line, [the State] is now somehow shifting the burden of proof to me." 2 VRP at 94. The trial court sustained the objections and directed the prosecutor to rephrase his argument.

The prosecutor responded:

> Remember the burden is always on [the State]. But what these [injuries] show support Ms. Sharpley's testimony. These got here because the defendant punched her numerous times in the face. It's the only way they get there is from repeated punches to the face. The evidence from the CT scan, the damage to her eye, gets there from the punches. That's how this happens.

2 VRP at 94. The prosecutor then briefly argued that the jury should convict Burns of assault in the second degree, rather than the lesser charge of assault in the fourth degree. After the prosecutor finished, the trial court also reminded the jury that the State had the burden of proving each element of the offense beyond a reasonable doubt and that Burns had no burden to establish a reasonable doubt.

### 2. Defense closing argument

At the start of Burns' closing argument, defense counsel reiterated that the State had the burden of overcoming the presumption of innocence and that Burns had the right to not testify and the jury could not infer guilt from the exercise of this right. Defense counsel then argued that the State had not presented evidence sufficient to prove each element of the crime beyond a reasonable doubt. Defense counsel emphasized that Sharpley was injured and that she was the only one saying Burns had injured her. Defense counsel then argued that Sharpley's testimony was not consistent and that she had testified about many details that she had not mentioned in any previous statement. Counsel further argued that it was not the defense's burden to prove anything and that the State had not proved that Burns assaulted Sharpley.

Defense counsel also discussed Rose's credibility as an alibi witness, mentioning that she was Burns' girlfriend and that it was now "official." 2 VRP at 101. Defense counsel then commented that it was not unusual for an alibi witness to have a relationship with the defendant and that this did not necessarily mean that they were not credible witnesses. Counsel further argued that the State was asking the jury to speculate that Rose and Burns' relationship became "official" as a result of this case and that there was no evidence supporting that assertion or any evidence explaining why or how the relationship became "official." 2 VRP at 104.

Defense counsel continued:

> How did Ms. Sharpley get injured? By whom? By what? Again, I don't know. And I don't have to tell you how, I don't have to give you some theory about it, I don't have to posit any evidence saying maybe this is how it happened, maybe this is how it happened. Again, I know it's beating a horse here, but I have no burden. Mr. Burns has no burden. This is not a game of Clue. It is not your job to try and figure out what exactly happened, and if he didn't do it, who did.
>
> Your sole responsibility under the law is to decide whether or not the State has met its burden of proof beyond a reasonable doubt for each and every element of this crime charged. Meaning, have they proven to you beyond a reasonable doubt that on June 29th of 2012, Mr. Burns assaulted Ms. Sharpley and that's how her injuries were caused.

2 VRP at 104-05. Defense counsel ended her argument by reiterating that the State had not met its burden. After defense counsel finished, the trial court once again advised the jury that the State had the burden of proof.

### 3. State's rebuttal

In rebuttal, the prosecutor again argued that the case came down to whether the jury found Sharpley or Rose more credible. The prosecutor reiterated that the State had the burden to prove the crime beyond a reasonable doubt, and argued that it had met its burden because Sharpley's statements were consistent over time and she had explained why her trial testimony was more

No. 45195-6-II

detailed that her prior statements. The prosecutor again mentioned that Rose and Burns'

relationship status changed from unofficial to official soon after Burn's was charged, that Rose's

relationship with Burns had "advanced" as a result of the charges, and that this gave Rose reason

to want to protect Burns. 2 VRP at 111. Burns did not object to this argument.

Finally, the prosecutor argued,

> The simple fact is that Ms. Sharpley was injured. And this level of [in]jury is an assault two. It is a substantial bodily harm that she suffered. She didn't hit herself. These injuries did happen. They support her testimony. If you believe Ms. Sharpley and the consistent version of events she has given you along with the other physical evidence, then I have met my burden. That is all that is necessary for you to have proof beyond a reasonable doubt.

2 VRP at 116-17. Burns did not object to this argument.

The jury found Burns guilty as charged. Burns appeals.

ANALYSIS

I. DENIAL OF FOR CAUSE CHALLENGE

Burns first argues that the trial court violated his right to a fair trial before an impartial jury

when it denied the defense motion to strike Juror 22 for cause. Even assuming, but not deciding,

that Burns has properly preserved this argument, it fails.[7]

Because the trial court is able to observe the juror's demeanor and to evaluate the juror's

answers, "[t]he trial judge is best situated to determine a juror's competency to serve impartially."

---

[7] The State contends that under *State v. Clark*, 143 Wn.2d 731, 762, 24 P.3d 1006, *cert. denied*, 534 U.S. 1000 (2001), Burns did not preserve this argument because he failed to use all of his peremptory strikes. Burns contends that *State v. Fire*, 145 Wn.2d 152, 158, 34 P.3d 1218 (2001), establishes that he was not required to exercise all of his peremptory strikes in order to bring this challenge. Because we choose to resolve this issue on the merits, we do not address the preservation issue.

15

*State v. Rupe*, 108 Wn.2d 734, 749, 743 P.2d 210 (1987), *cert. denied*, 486 U.S. 1061 (1988).

Thus, we review for abuse of discretion a trial court's denial of a for-cause juror challenge. *Rupe*, 108 Wn.2d 748.

The trial court should grant a challenge for cause only when the challenged juror exhibits a probability of actual bias[8] such that the juror holds opinions or beliefs that the juror cannot put aside for the purpose of impartially deciding the merits of the case. *State v. Noltie*, 116 Wn.2d 831, 839-40, 809 P.2d 190 (1991). The trial court should not have disqualified a juror merely because the juror has opinions that may affect the determination of the issues. Instead, "[t]he question is whether a juror with preconceived ideas can set them aside." *Rupe*, 108 Wn.2d at 749. Equivocal answers alone do not require that a juror be removed when challenged for cause. *Rupe*, 108 Wn.2d at 749.

Juror 22's comments about whether his relationships with law enforcement would affect his ability to be fair and impartial was, at times, equivocal. But he also stated that he knew several law enforcement officers and understood that they were not always credible. And Juror 22 agreed that he could decide the case based on the evidence despite his relationships with several law enforcement officers. Given this, we cannot say that trial court abused its discretion in allowing Juror 22 to remain on the jury despite his relationship with law enforcement officers.

---

[8] Actual bias is "the existence of a state of mind on the part of the juror in reference to the action, or to either party, which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging." RCW 4.44.170(2). The burden of showing actual bias rests on the party challenging the juror for cause. *State v. Wilson*, 141 Wn. App. 597, 606, 171 P.3d 501 (2007).

Similarly, Juror 22 was often equivocal about whether his prior personal experiences would affect his ability to be fair and impartial. As noted above, however, equivocal answers alone do not require that a juror be removed when challenged for cause. *Rupe*, 108 Wn.2d at 749. Here, Juror 22's final discussion with the State in which he stated that he could "separate out"[9] the crimes that had been committed against him and his family from those involving the defendant and that he could decide the case based on the evidence presented if the defendant was not the person involved in the prior acts against him and his family, was sufficient to allow the trial court to conclude that Juror 22 was not actually biased.[10] Accordingly, we hold that the trial court did not abuse its discretion when it denied the defense motion to excuse Juror 22 for cause.

## II. PROSECUTORIAL MISCONDUCT

Burns next argues that the prosecutor committed prejudicial prosecutorial misconduct during closing argument by (1) shifting the burden to the defense, and (2) arguing facts not in evidence. We disagree.

### A. Standard of Review

To prevail on his claim of prosecutorial misconduct, Burns must establish that the prosecutor's conduct was both improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). If Burns can establish that the conduct was improper, we review the conduct for

---

[9] VRP (Voir Dire) at 122.

[10] Burns' reliance on *State v. Gonzales*, 111 Wn. App. 276, 45 P.3d 205 (2002), *review denied*, 148 Wn.2d 1012 (2003), is not persuasive. The juror in *Gonzales* expressly stated that she was unsure that she would be able to respect the presumption of innocence if a police officer testified. *Gonzales*, 111 Wn. App. at 279. Here, in contrast, Juror 22 never expressly stated that he was unsure he could apply the required presumptions in light of police testimony.

17

prejudice under one of two different standards. *Emery*, 174 Wn.2d at 760. When a defendant timely objects to the alleged instances of misconduct, the defendant must show that the prosecutor's misconduct had a substantial likelihood of affecting the jury's verdict. *Emery*, 174 Wn.2d at 760. When a defendant fails to object to alleged misconduct, the defendant waives the error unless he can show that the misconduct was so flagrant and ill-intentioned that no instruction could cure the prejudice and that the prejudice had a "'substantial likelihood of affecting the jury verdict.'" *Emery*, 174 Wn.2d at 761 (quoting *State v. Thorgerson*, 172 Wn .2d 438, 455, 258 P.3d 43 (2011)). We review alleged improper statements in the context of the entire argument, the issues in the case, and evidence presented at trial. *State v. Dhaliwal*, 150 Wn.2d 559, 578, 79 P.3d 432 (2003). Burns objected to the first instance of alleged misconduct, but not the second. But even if Burns had objected to both instances, this argument fails.

### B. Burden Shifting

Burns argues that the prosecutor engaged in misconduct when he argued in closing that someone had to have caused Sharpley's injuries and that there was "'no other explanation for'" the injuries other than Burns having assaulted her. Br. of Appellant at 24 (quoting 2 VRP at 94). He contends that the prosecutor made this argument twice, once in his initial closing argument and again at the end of his rebuttal argument. Burns objected to the first argument, but not the second. Even if Burns had objected to both arguments, his argument fails.

After the prosecutor argued that there was "no other explanation for"[11] Sharpley's injuries, Burns objected. The trial court sustained the objection and told the prosecutor to rephrase his

---

[11] 2 VRP at 94.

argument. When the prosecutor rephrased his argument, he reiterated that the burden of proof was on the State. Additionally, at end of the prosecutor's argument, the trial court reminded the jury that the State had the burden of proving each element beyond a reasonable doubt and that Burns had no burden to establish a reasonable doubt existed. Furthermore, defense counsel's argument repeatedly reminded the jury that the State had the burden of proof and that Burns had no duty to present evidence. And the jury instructions also instructed the jury that the lawyers' remarks and arguments were not the law and that the law was contained in the instructions, which said that the State had the burden of proof and the defendant did not have to prove that a reasonable doubt existed.

Although the prosecutor's arguments could have suggested that Burns had failed to present an alternative explanation for Sharpley's injuries and, thus, suggested that Burns had some burden to produce evidence, the trial court's repeated oral instructions to the jury, both parties' repeated statements during their closing arguments, and the written instructions clearly instructed the jury of the proper burden of proof. Because of these repeated admonitions and instructions and given the brief nature of the prosecutor's possibly improper closing arguments, Burns has not shown this potential error had a substantial likelihood of affecting the jury's verdict and his argument fails. *Emery*, 174 Wn.2d at 760.

### C. Arguing Facts Not in Evidence

Burns further argues that the prosecutor (1) misrepresented Rose's testimony when he suggested that he had asked Rose about whether she was giving Burns an alibi, and (2) suggested that the reason Rose and Burns' relationship had become "'official'" was to get Rose to testify on

Burns' behalf. Br. of Appellant at 29 (quoting 2 VRP at 92). Burns argues that this argument was not based on the evidence. We disagree.

Comments that "'encourage [the jury] to render a verdict on facts not in evidence are improper.'" *State v. Stith*, 71 Wn. App. 14, 18, 856 P.2d 415 (1993) (quoting *State v. Stover*, 67 Wn. App. 228, 231, 834 P.2d 671 (1992), *review denied*, 120 Wn.2d 1025 (1993)). But the prosecutor has wide latitude in closing arguments to draw reasonable inferences from the facts in evidence and to express such inferences to the jury. *Dhaliwal*, 150 Wn.2d at 577. Such is the case here.

On cross-examination, the prosecutor asked Rose if it was her testimony that Burns was with her at the time of the crime. Although the prosecutor did not use the word "alibi," his argument that he had asked Rose if she was providing Burns with an alibi is a reasonable characterization of what happened during Rose's cross-examination. Thus, the prosecutor was not arguing facts not in evidence when he made this statement.

Similarly, the prosecutor's argument suggesting that the change in Rose and Burns' relationship gave Rose a reason to provide an alibi was a reasonable inference from the evidence. The timing of the change in their relationship coincided with the charges against Burns, Rose testified that she and Burns had talked about the charges, and Rose never contacted law enforcement or the prosecutor's office to tell them that Burns had an alibi. It was a reasonable inference that the change in relationship status, which apparently benefitted Rose, was the reason she was now providing an alibi. Thus, the prosecutor was not arguing facts not in evidence when he made this argument.

## D. Denigrating a Witness

Burns also appears to argue that the prosecutor engaged in misconduct when he "denigrate[d] Rose's version of [the] events, calling it a 'story.'" Br. of Appellant at 28 (quoting 2 VRP at 85). But the prosecutor referred to both the State's and Burns' theories of the case as "stor[ies]," and, taken in context, the prosecutor's use of the term "story" was not intended to denigrate Rose's testimony. *See* 2 Verbatim Report of Proceedings at 85 (emphasis added) (stating "[y]ou should look at the reasonableness of [the] statements that people make, you should look at whether they have a bias in what they are saying, you should look at [whether] the *story* they are giving you is reasonable given the context" when describing generally how to evaluate credibility); at 86 (emphasis added) (referring to Sharpley's testimony as the "*story* of events of what occurred"); and at 93 (emphasis added) (stating, "As you look at the *stories* that you have been presented and the evidence that you have been presented, the evidence supports Mrs. Sharpley's version of events," when discussing Sharpley's testimony). Accordingly, this argument fails.

## E. Personal Opinion

Burns further argues that the prosecutor engaged in misconduct when he "stat[ed] his personal opinion about how he was 'more confused' as [Rose's] testimony went on." Br. of Appellant at 28 (quoting 2 VRP at 87). Burns appears to argue that this was improper argument that expressed the prosecutor's personal opinion about Rose's credibility. This argument is not preserved.

After arguing that it was inconsistent for Rose to say Burns was no longer in a relationship with Sharpley and then claim Burns was upset because Sharpley was communicating with another

man, the prosecutor commented, "[W]e then hear more of her story, Ms. Rose's story, and I begin to become more confused." 2 VRP at 87. Burns did not object to this argument.

It is misconduct for a prosecutor to state his or her personal belief as to a witness's credibility. *State v. Warren*, 165 Wn.2d 17, 30, 195 P.3d 940 (2008) (citing *State v. Brett*, 126 Wn.2d 136, 175, 892 P.2d 29 (1995), *cert. denied*, 516 U.S. 1121 (1996)), *cert. denied*, 556 U.S. 1192 (2009). But Burns did not object to this argument, thus, even assuming but not deciding that this argument was improper, he has waived this issue unless he can show that the improper argument was so flagrant and ill-intentioned that no instruction could have cured the prejudice and that the prejudice would have had a substantial likelihood of affecting the jury's verdict. *Emery*, 174 Wn.2d at 761. To the extent the prosecutor's reference to his becoming more confused is improper argument reflecting his personal opinion of Rose's credibility, if Burns had objected, the trial court could have told the jury to disregard this statement and informed the jury that it (the jury) was the sole credibility judge. Because this comment could have been cured with a proper instruction had Burns objected, Burns has waived this issue. Thus, Burns has failed to establish prosecutorial misconduct.

### III. SAG

#### A. Ineffective Assistance of Counsel

In his SAG, Burns argues that his trial counsel provided ineffective assistance when she failed to use a peremptory challenge to avoid seating Juror 22. We disagree.

To establish ineffective assistance of counsel, Burns must show that his counsel's representation was deficient and that he was prejudiced as a result. *State v. McNeal*, 145 Wn.2d 352, 362, 37 P.3d 280 (2002). Counsel's performance is deficient only if it falls below an objective

standard of performance. *McNeal*, 145 Wn.2d at 362. Prejudice results where there is a reasonable probability that but for counsel's deficient performance, the outcome would have differed. *McNeal*, 145 Wn.2d at 362.

Burns does not point to anything suggesting that Juror 22's presence on the jury prejudiced him nor does the record reveal any potential prejudice. And because we hold above that the trial court did not err when it denied the defense motion to excuse Juror 22 for cause, Burns does not show that his counsel's failure to use a peremptory strike prevented us from addressing whether the trial court erred in denying Burns' motion to strike the juror for cause. Accordingly, this argument fails.

### B. Judicial Bias

Finally, Burns appears to argue that the trial court judge was biased. Burns cites to the trial court's failure to grant the motion to excuse Juror 22 for cause and two instances where the trial court overruled objections to the State's closing argument asserting the State was arguing facts outside the record. This argument fails.

The appearance of fairness doctrine requires the absence of actual or apparent bias on the part of the judge or decision-maker. *State v. Worl*, 91 Wn. App. 88, 96, 955 P.2d 814 (citing *State v. Dagenais*, 47 Wn. App. 260, 261, 734 P.2d 539 (1987)), *review denied*, 136 Wn.2d 1024 (1998). To succeed on this claim, Burns "must present evidence of actual or potential bias." *Worl*, 91 Wn. App. at 96. "Judicial rulings alone almost never constitute a valid showing of bias." *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 692, 101 P.3d 1 (2004).

No. 45195-6-II

We hold above that the trial court did not abuse its discretion in allowing Juror 22 to remain on the jury; thus, this cannot be evidence of bias. And ruling against a defendant on objections during closing argument is not evidence of bias. Accordingly, this argument fails.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Sutton, J.

We concur:

Worswick, P.J.

Melnick, J.

24